## MARY RUZICKA V. STATE OF NEBRASKA.

289 N. W. 852

FILED JANUARY 26, 1940. No. 30579.

*Guy A. Hamilton* and *Stanley Bartos,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

CARTER, J.

The plaintiff in error, Mary Ruzicka, was convicted in the district court for Fillmore county of stealing $2,711 in money from Mike and Jennie Kubicek, and was sentenced to serve three to five years in the reformatory for women. From this conviction and sentence the defendant below prosecutes error and presents to this court a record of her conviction for review.

The record shows that on August 16, 1938, Dorothy LeGrand, an Assyrian woman professing to be a fortune teller and Indian healer, went to the home of Mike and Jennie Kubicek near Milligan, Nebraska, and offered to effect a cure for Mike Kubicek, who was then suffering from a cancer of the throat. As a means of ingratiating herself into the confidence of the Kubiceks, she produced a note purporting to have been signed by the defendant, a

cousin of Mike Kubicek, which stated in substance that Dorothy LeGrand had cured her of gall stones, that she would cure him also if he would follow her instructions and believe in her, and that she was honest. The result was that Dorothy LeGrand started in that afternoon to cure Mike Kubicek of his affliction.

The method employed called for the use of money, a bowl of water, broomstraws and charcoal, which, when accompanied by the prayers of Dorothy LeGrand, was to result in a complete cure of Mike Kubicek. On the first day the sum of $6 was solemnly dipped in the water, blessed by Dorothy LeGrand and ceremoniously pinned on the breast of the patient. On subsequent days in which Dorothy LeGrand attended her patient, the amount of money was increased until the sum of $2,711 was being used; the amount of money used having been determined by the number of knots which Jennie Kubicek could tie in a strip of cloth provided by Dorothy LeGrand, the 27 knots so tied requiring the use of $100 for each knot. The result was that the money was abstracted and these trusting complainants bilked out of the whole $2,711. Law enforcement officers found Dorothy LeGrand in Spokane, Washington, with a newly purchased automobile and a small amount of money in her possession. She was returned to Fillmore county, where she entered her plea of guilty to the crime.

The record further shows that Mary Ruzicka, the defendant, was the wife of Frank Ruzicka, a farmer living near Dorchester, Nebraska. She was fifty-nine years of age at the time Mike and Jennie Kubicek were defrauded of their money. It appears that defendant believed she was endowed with certain faith-healing powers as was evidenced by a certificate issued to her by the State Spiritualists Association of Nebraska, declaring her to be a recognized faith healer. On August 13, 1938, defendant, while attending a picnic at Milligan, Nebraska, went to a concession booth operated by Dorothy LeGrand, and had her fortune told. She was told that she was suffering from gall stones, which in reality was a fact. The ensuing conversation re-

sulted in Dorothy LeGrand agreeing to call upon defendant at her home to cure her of her affliction. Later in the day, defendant took her aged aunt, Josie Novatny, to Dorothy LeGrand to have her fortune told. The interview resulted in a pronouncement that the aunt was suffering from kidney trouble, and also a declaration by Dorothy LeGrand that she could cure her with one treatment. The evidence also shows that defendant later met Jennie Kubicek at the picnic and informed her of her faith in the powers of Dorothy LeGrand and of her belief that Mike Kubicek might be helped by her treatments.

Pursuant to her arrangement with defendant, Dorothy LeGrand called at her home on August 16, 1938, and gave the first treatment. Defendant did not have the required fee of $2, and defendant's husband drove a team and wagon to the home of his daughter and her husband, one-half mile distant, to obtain it. During his absence Dorothy LeGrand insisted that she had to have three or four other articles to hang in her church to effect a cure. By this means she obtained a dresser scarf, a bed spread and a dress which were to be returned after the last treatment. They, of course, were never returned. Defendant then testifies that Dorothy LeGrand inquired about any persons in the neighborhood who were suffering with cancer. The names of Mike Kubicek and a Mrs. Halverson were given to her. Upon request, defendant wrote a note, introductory in character, to each of the two named persons. The written notes were not produced at the trial, and there is much conflicting secondary evidence as to their exact contents. An examination of all the evidence regarding the contents of the notes convinces us that they recited that Dorothy LeGrand had given defendant a treatment for her gall stones, that she had been helped thereby, and that the addressees of the notes should give her a trial. Other claimed differences in the notes are not material to a disposition of the case, although there is substantial evidence that a substituted note was delivered to the Kubiceks. Defendant testifies that Dorothy LeGrand came back on August 19, 1938,

and gave her a second treatment consisting of the use of the -Bible and a prayer, accompanied by a rubbing near the afflicted area. Demands were made for other household articles which were refused and, according to defendant, resulted in some ill feeling and distrust. It is the contention of defendant that she never again saw Dorothy LeGrand until she saw her in jail in Geneva, where she was being held for stealing the money of the Kubiceks. Defendant denies that she had anything to do with the larceny, claims she never saw Dorothy LeGrand during the period the fraud was being perpetrated, and positively denies that she ever received any part of the money. It is not contended that any of the stolen currency was found in the possession of the defendant.

The state bases its case almost entirely upon the evidence of Dorothy LeGrand, who, upon her arrest, implicated the defendant as an accessory. The story told by Dorothy LeGrand was substantially as follows: She had spent most of her life traveling over the United States with carnival companies. She had been married three times and was in the habit of using aliases including the names of her former husbands. During the times herein mentioned she was using the name of Mary Starr. There is little dispute in the evidence as to the transactions and conversations between defendant and Dorothy LeGrand at the Milligan picnic. The evidence of Dorothy LeGrand is that the first time she called on defendant at her home, and while defendant's husband was driving over to his daughter's house to borrow $2 to pay her, defendant conspired with her to defraud the Kubiceks. The testimony of Dorothy LeGrand is that she was not a faith healer and knew nothing of the art, that all she knew about it she learned from defendant during the half hour Frank Ruzicka was away, and that defendant instructed her in the use of the bowl of water, broomstraws, charcoal, and the Bible, and taught her to pray in order to gain the complete confidence of her victims. She testifies that defendant instructed her concerning the whole method of procedure and demanded that she

be given half of the ill-gotten gain as her share. Her evidence also is that on her second call on defendant on August 19, 1938, she informed defendant that she was about to take the money and that she would meet her at the crossroads a half mile from the Ruzicka home on the following Friday night, August 26, 1938, at 8 p. m., to divide the $2,700. She testifies that she did meet defendant near the designated crossroads as agreed and delivered $1,300 in currency to her, and that she thereupon took flight to avoid the punishment she so justly deserved.

The positive evidence of Frank Ruzicka, Leona Peterson and Paul Peterson, defendant's husband, daughter and son-in-law, respectively, is to the effect that on the evening of August 26, 1938, from 5 p. m. until the next morning, the defendant was at and near the family home and did not and had no opportunity to meet Dorothy LeGrand at the crossroads as she testified. The defendant also produced the evidence of five reputable residents of the Dorchester community who had known the defendant for many years, who testified that her general reputation as a law-abiding citizen was good. No evidence to the contrary was produced.

The sheriff of Fillmore county testified, among other things, that at the time of the arrest of the defendant, her husband said: "How much money will it take to settle this so she won't have to go to Geneva?" The contention is advanced that this was evidence of guilt. We think the husband satisfactorily explained the statement when he said he was inquiring about giving a bail bond. But in any event the statement of the husband could not be used as an admission of guilt against this defendant. The statement was not admissible for any purpose.

The defendant complains of many alleged errors. Under our view, the case can be decided on the question of the sufficiency of the evidence to sustain the conviction and it will not be necessary to discuss other features of the case.

· Under the law of this state, an accessory before the fact of a felony is equally guilty with the principal. Comp. St. 1929, sec. 28-201. The guilt of the principal in this case,

Dorothy LeGrand, is conclusively established by the evidence. Also, it is the settled law of this state that a conviction may rest upon the uncorroborated evidence of an accomplice when sufficient in connection with the other evidence to satisfy the jury beyond a reasonable doubt of the guilt of the accused. *Lamb v. State,* 40 Neb. 312, 58 N. W. 963; *Barnes v. State,* 124 Neb. 826, 248 N. W. 381; *Lovejoy v. State,* 130 Neb. 154, 264 N. W. 417. Likewise, it is ordinarily for the jury to determine the credibility of the accomplice and the weight to be given to his testimony. But even so, the evidence must be sufficient to sustain a finding of guilt beyond a reasonable doubt as a matter of law before the verdict of a jury will be permitted to stand. We think a reasonable doubt was created as a matter of law, which precludes a verdict of guilty under the evidence produced. It will be our purpose in the remainder of this opinion to point out the evidence which creates a reasonable doubt as a matter of law.

The evidence is clear that Dorothy LeGrand was an Assyrian woman whose occupation was fortune telling and Indian faith healing, a person usually spoken of as a Gypsy and having the vagabond habits and traditional occupation of the Gypsy peoples. She denies that she was a healer of any kind and claims that the defendant taught her all she knew about it in a thirty-minute interval in the absence of defendant's husband. That this statement is absolutely false is borne out by her own testimony. The very first time Dorothy LeGrand interviewed the defendant she told her she had gall stones and agreed to come to defendant's home to treat her. She came to the home and, according to her own evidence, administered a treatment and insisted upon and obtained pay therefor before any conversation was had about bilking the Kubiceks. Her admitted inquiries about prospective cancer patients, and her claims that she could cure them, likewise belie her testimony that she was not a faith healer.

The use of the broomstraws, charcoal, bowl of water and other articles employed in healing Mike Kubicek was not

the work of a beginner. The finesse with which Dorothy LeGrand induced the Kubiceks to increase the amounts of money used from $6 to $11 to $111 to $1,411 and finally to $2,711 was not learned in a thirty-minute session with a simple Czech farm woman. The credulity of this court is such that we cannot accept the statement of Dorothy Le-Grand to that effect as true when considered in the light of the evidence and circumstances surrounding this case.

It is the testimony of Dorothy LeGrand that she called on defendant the second time on August 19, 1938. At that time she says that she told Mary Ruzicka that she would have $2,700 to divide with her on August 26, 1938, and that she made an appointment to meet Mary Ruzicka at the crossroads near her home at 8 p. m. of said day. In the first place, Dorothy LeGrand, at the time of this conversation, had induced the Kubiceks to put up the sum of $11 only, and she positively had no way of knowing how much she would be able to take. The knot-tying episode did not take place until later, and unless this court is going to concede that Dorothy LeGrand could divine the future, we must necessarily take the view that she deliberately falsified when she made this statement. Her testimony that she did meet the defendant at the crossroads at the designated hour and gave her $1,300 appears very unreliable. In the first place she says she came to the crossroads in a car driven by one Bob Stanley, met Mary Ruzicka where it was light and where she was plainly seen. The evidence of Stanley is that he parked his car while Dorothy LeGrand got out and walked down the road in total darkness and that he at no time saw Mary Ruzicka. The evidence of the husband, daughter and son-in-law of the defendant is that Mary Ruzicka never left their company on the night of August 26, 1938, at the time claimed by Dorothy LeGrand, and that she had no opportunity to do so. It might be expected that these witnesses, being interested, might color their testimony to aid Mary Ruzicka, but it does not appear probable, nor can it be presumed, that they would commit a deliberate perjury and fabricate a story which was much

more plausible than that told by Dorothy LeGrand herself. The evidence shows that Dorothy LeGrand had previously arranged for her traveling companions to depart for the west earlier in the day, with the understanding that she and Stanley would overtake them along the road. With preparations made for flight immediately after the stealing of Kubiceks' money, it requires an elastic imagination to believe that Dorothy LeGrand was so honest and reliable that she would drive out of her way to give $1,300 to this defendant. Certainly, the pursuit would be just as determined, whether she divided the spoils with Mary Ruzicka, or not. It is also noticeable that at the time of the trial of this defendant, Dorothy LeGrand, although she had entered her plea of guilty and had long before confessed her guilt, had not been sentenced. It is not difficult to believe that the fantastic tale unfolded by her was prompted somewhat by the hope of immunity from punishment. All of these evidences of the unreliability of Dorothy LeGrand as a witness, and the established good reputation of this defendant generally as a law-abiding citizen, establish as a matter of law, we think, that there is a reasonable doubt of the guilt of this defendant.

The evidence as a whole shows that Dorothy LeGrand was an admitted felon, a cheat and a fraud. She apparently has no respect whatsoever for truth. The contradictions in her own testimony are sufficient to show her unreliability as a witness. If the discredited testimony of so unreliable a witness is sufficient without corroboration to send a reputable person to prison, then our rule requiring proof of guilt beyond a reasonable doubt becomes a meaningless phrase and a mockery.

The state takes the view that a jury question was presented and that any attempt on the part of this court to arrive at a different conclusion would amount to a usurpation of the duties of the jury. We, of course, take the view that the evidence is insufficient to sustain a conviction as a matter of law, and that we are therefore obliged to direct a reversal of the case. We think, also, that our position is

supported by a decision of this court which is very much in point. In *Jahnke v. State,* 68 Neb. 182, 104 N. W. 154, we said: "The evidence of an accomplice should be closely scrutinized. If it appears that such witness has wilfully sworn falsely in regard to a material matter upon the trial, his evidence cannot be sufficient, if uncorroborated, to support a verdict of guilty."

In *Sykes v. United States,* 204 Fed. 909 (8 C. C. A.), the court disposed of a very similar case in the following language: "It is only when the evidence is sufficient to convince of the guilt of the accused beyond a reasonable doubt that one may lawfully be convicted of a crime. 'It is undoubtedly the better practice,' says the supreme court, 'for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them.' *Holmgren v. United States,* 217 U. S. 509, 523, 524, 30 Sup. Ct. 588, 592 (54 L. Ed. 861, 19 Ann. Cas. 778). And the conclusion is that the uncorroborated testimony of the confessed perpetrator of a crime, contradicted under oath by herself, contradicted by other witnesses, and inspired by the hope of immunity from punishment, which in this case has since turned to glad fruition, that another was an instigator or a participator in the perpetration of her crime, is not only insufficient to establish his guilt beyond a reasonable doubt, but that it presents no substantial evidence of it. *Jahnke v. State,* 68 Neb. 154, 94 N. W. 158."

A consideration of all the evidence adduced at the trial and the circumstances surrounding the commission of the alleged crime requires us to hold that the state has failed to produce evidence sufficient to sustain a finding of guilt beyond a reasonable doubt.

REVERSED.

PAINE, J., dissenting.

I respectfully dissent from the opinion finally adopted by this court. The case was first argued to the court on September 21, and ordered reargued on November 20, 1939. The reversal of conviction is based on the question of the

sufficiency of the evidence to sustain the verdict of guilty returned by the jury.

The defendant denied her guilt, but the only conclusion to be drawn from the verdict is that the jury did not believe the story she told on the witness-stand.

What were the facts, as shown by the evidence, which the jury did believe?

Dorothy LeGrand testified that she was 60 years of age, born in Cincinnati, Ohio, and was an Assyrian. She had a concession at the Milligan street picnic in August, 1938, and gave advice and mind readings in a trailer. She testified that she charged her customers what they could pay; that some paid 15 cents, some 25 cents, some 50 cents, and some a dollar; that she had been making her headquarters with Robert Stanley and family at Bradshaw; that the car and trailer that she used belonged to Mr. Stanley, who drove her in it.

She testified that the defendant came in to have her fortune told on Saturday, and in making the reading she told the defendant she had gall stones. Defendant asked whether she could cure them, and Mrs. LeGrand replied that she did not know. Defendant then invited her to come over to defendant's home and pray for her. Therefore, on the following Tuesday Robert Stanley drove her in his Chevrolet to Mrs. Ruzicka's, but the roads were so muddy that they stopped at a house on the corner and sent word from there to the Ruzicka house, and the defendant's husband came for her in a farm wagon, and this was about noon.

While Mrs. LeGrand was treating her, the defendant sent her husband to the son-in-law's to get $2 to pay Mrs. LeGrand. While he was gone, a period of between half and three-quarters of an hour, the defendant told her to go and see Mike Kubicek, her cousin, who was sick with a cancer, and to heal him, and that the Kubiceks had plenty of money and plenty of property, and for her to get plenty, and "You will have to give me half." Then the defendant told her about a lady at McCool who had a cancer too, but not to take much money from her, for she was poor, and the de-

fendant at once, and voluntarily, wrote a note of introduction to both of these parties and gave them to her.

Mrs. LeGrand took these letters of introduction, but did not tell the defendant that she was illiterate and could not read nor write. She promised the defendant that she would give her half, regardless of what she got from Mike Kubicek, and the defendant's husband took her back to the car in his farm wagon, and she agreed to come back Friday and report what progress she had made.

Mrs. LeGrand went to the Kubiceks, arriving there in the afternoon of the same day. When she arrived the children were at home, but their parents had gone to see a doctor. She showed the children the note, and she told the children that the defendant had sent her there to heal their father. As soon as the Kubiceks returned, both of them read the note.

This very important letter of introduction written by the defendant, which instantly gained entrance into the home and heart of the sick man, was destroyed, but several people had read it, and the version which the jury doubtless accepted, from the several forms as recollected and testified to by witnesses, would read to this effect:

"Dear Cousin Mike.

"This lady cured me of gall stones and she will cure you too if you believe in her and do everything she tells you. She is honest."

Signed "Mary Ruzicka"

Mrs. LeGrand, having gained their confidence through the note of the defendant, wasted no time in starting operations, and told Mrs. Kubicek that if she wanted her husband cured she would have to live up to her request, and that was the use of numbers of money. They gave $6, and Mrs. LeGrand tied it up and pinned it on Mr. Kubicek, and the next time she called she asked for more money, and told them she could not help them without more money, and they added $5 to the $6 that was already pinned on his chest, but she told them he could not be healed without more money.

When she went back a fourth time they had $100, and that was wrapped up in a small package with the $11, and it was all pinned on Mr. Kubicek's chest, and she insisted on more money.

The widow Kubicek testified that, when Mrs. LeGrand demanded much more money to bring about a cure of her husband's cancer, although she went with him to the Geneva State Bank, and signed the note with him and borrowed the first $1,300, and took it home in a package fastened with rubber bands, yet she had become suspicious, and had her daughter Goldie and her son Mike take down a list of the letters and numbers on each bill, with the denomination of each piece of currency, and this list was introduced as state's exhibit No. 7, which gives the serial letters and numbers of the five 100-dollar bills and the forty 20-dollar bills, making the $1,300 brought from the Geneva State Bank, with the rubber bands around it.

Mrs. Kubicek testified that Mrs. LeGrand at the next "treatment" placed the $1,411 in the Bible, wrapped in a cloth, and had Mr. Kubicek sleep on it, and told them they must have more money, and she would come back on Friday, August 26.

Mrs. LeGrand's testimony in regard to the final amount is interesting. She was furnished a piece of cloth, and cut it off to a certain length, and she testified: "Q: How much more did you tell them? A. Thirteen hundred more. Q. That would make $2,711. How did you determine, decide on the amount of money? A. Well, I made her tie twenty-seven knots into a piece of cloth. Q. And each knot was to represent what? A. Hundred dollars." This piece of cloth, in which only 27 knots could possibly be tied, is in evidence as exhibit No. 3.

Several days before the "final treatment," Mrs. LeGrand drove to the defendant's home, where she was cooking dinner, and talked the matter over and told her that she was preparing to take the Kubicek money, and for her to meet her shortly after 8 o'clock Friday night, and told her how much money she would have with her, and the defendant

was willing to accept her share. She did not stay long, as the defendant told her to get out of the house before her husband came.

At the time of this "final treatment," Mrs. LeGrand waited until Mr. and Mrs. Kubicek came back from the bank, and then they all went in the house. The Kubiceks had just secured a second $1,300, which was in a canvas bag, and the five-, ten-, and twenty-dollar bills were loose in the sack. Mrs. LeGrand took them out and tied them up in a cloth with the other money, making a total of $2,711, putting them all together. The first package of $1,300 she put on the inside and the last money was rolled around it, and she tied it all up and put it in a new Bible, which she had required them to buy, and then tied the Bible in a tablecloth, and sent Mr. and Mrs. Kubicek to the river to say their prayers, and they took the Bible with them. When they returned from praying they all went in the dining-room, and Mrs. LeGrand ordered the children to go outside. Then she had Mr. and Mrs. Kubicek get down on their knees and pray, during which time Mrs. LeGrand abstracted the money from the Bible and replaced it with a package of newspapers, which she had already prepared before she came there, and tied it all up in the tablecloth, and instructed them not to open the package until 5 o'clock Monday afternoon. The Bible and the substituted package of newspapers were introduced in evidence. Mrs. LeGrand immediately left with the $2,711 in currency.

She told the Kubiceks when she left that she was going to see Mrs. Ruzicka, the defendant, and she went straight to the defendant's and stopped at the same place where she stopped on the muddy day at the farm corner, and she got out and met Mrs. Ruzicka, and it was after dark, and she gave her the $1,300 as her part, and the defendant said, "You better go on about your business before you are caught."

Mrs. LeGrand testified she had seen the defendant four times altogether, once at the picnic at Milligan, when she gave her a reading, twice at her house, and once on the road at night when she gave her the money.

The defendant's recollection of what she wrote in the letter of introduction to her cousin Mike, when Mrs. LeGrand made the first trip to her farm, differed slightly, but not materially, from the form set out hereinabove. She denied positively that she received the $1,300 from Mrs. LeGrand, and denied that she expected to get any money for writing the note to Mike Kubicek. She admitted that at the third time Mrs. LeGrand called on her, that is, on August 19, she asked whether the Kubiceks had money.

Sheriff Steinacher said he was called to the Kubicek home on Monday, August 29, about 7:30 a. m., when they discovered the bills were gone, and told of the robbery; that he drove at once to defendant's home, who told him at first that she did not know the lady she gave the note to, and claimed that she was forced to write it, but later withdrew such a claim.

The sheriff told how he traced the car through its Indiana license, and found that it was mortgaged, and the payment that was due August 30 was sent in from Post Falls, Idaho, by Stanley, and the sheriff sent wires out there and Mrs. LeGrand and Robert Stanley were arrested, and were in jail when he arrived at Spokane. Mrs. LeGrand finally confessed stealing the $2,700, and the sheriff testified that her confession was about as follows: "Well, she said that—that she made a number of trips to Mrs. Ruzicka's, and 'we planned that at Ruzicka's place while the husband was gone. She didn't want her husband to know anything about it, what was taking place.' As they planned it, she said that Mrs. Ruzicka told her to hit Kubiceks heavy because 'they have plenty of money, and if they can't—if they don't have the ready cash that they can borrow it, they have plenty of property,' that she wants to get hold of this money, that their place is covered with mortgage; she would like to buy a place of business where she could practice divine healing some place out of the state in a city."

The sheriff carefully examined the numbers on all of the bills they had in their possession at Spokane, and also on

$425 in bills they had just paid on a new trailer, and none of the currency examined bore any one of the numbers taken down by Goldie Kubicek from the first package of $1,300, and which Mrs. LeGrand testified were all in the package, still in rubber bands from the bank, when she handed the package to the defendant, Mary Ruzicka, the night before she left.

Paige Hall, county agent of Fillmore county, testified without objection that, after the courthouse offices were closed at 5 o'clock on the evening of September 12, he stepped out of his office and overheard a conversation between the defendant and her husband as they were going down the hall to the county attorney's office: "I heard Mrs. Ruzicka say, 'How did they get the numbers off from *this* money.' * * * He said, 'Goldie probably copied them off.'"

This is a brief summary of the evidence the jury considered in finding the defendant was guilty.

The information in this case charged in brief that the defendant, on or about August 26, 1938, in Fillmore county, did wilfully, intentionally, unlawfully, and feloniously, take, steal, and carry away $2,711, the property of Mike and Jennie Kubicek, against the will of the owners, and with the intent to defraud said owners of said property.

Section 28-201, Comp. St. 1929, reads as follows: "Whoever aids, abets or procures another to commit any offense may be prosecuted and punished as if he were the principal offender."

In a Cherry county cattle-stealing case, John Scharman hired two boys to steal cattle from the Metzger ranch near Merriman and deliver them to his place near Nenzel. The boys, having been arrested, pleaded guilty and implicated Scharman, and he was charged as a principal in the same manner in which the defendant was charged in the case at bar. This court held: "That the same rule as to the information, conduct of the case, and punishment, heretofore applicable to a principal, should thereafter govern his aider, abettor, or procurer, and that no additional facts need be alleged in an information against such accessory before the

fact than are required against his principal." *Scharman v. State,* 115 Neb. 109, 211 N. W. 613.

Complaint is made as to the court's instructions on aiding and abetting, and the testimony of accomplices. In our opinion the court gave the approved form, for instruction No. 9 told the jury that Dorothy LeGrand and Robert Stanley are accomplices, and that, while the accused might be convicted upon the testimony of accomplices, yet the jury should act on such testimony with great care and caution.

Again, in instruction No. 11 the court very properly said: "Under the law of Nebraska it is not necessary for the state to prove beyond a reasonable doubt that the defendant actually received or obtained any of the money charged to have been stolen from the Kubiceks. If you find beyond a reasonable doubt that the defendant in this action aided another or procured another to steal the money of the Kubiceks, or to take the same away from them without their consent, and with the intention to defraud the said Kubiceks, or to take the same away from them without their consent, and with the intention to defraud the said Kubiceks of their said property, then the defendant would be, in the eyes of the law, equally guilty as the person who actually took and carried away the money, and it is your duty to so find."

The evidence given the jury was direct, and also circumstantial. "What is meant by circumstantial evidence, in criminal cases, is the proof of such facts or circumstances connected with or surrounding the commission of the crime charged as tend to show the guilt or innocence of the party charged; and if these facts and circumstances are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding a verdict of guilty." *Cunningham v. State,* 56 Neb. 691, 77 N. W. 60.

It is not necessary that each link in the evidence relied upon should be proved beyond a reasonable doubt. This court has held: "The testimony of one witness, if relevant

and accepted by the jury, may sustain a conviction of burglary, even though the accused positively denies under oath that he committed the offense." *Schultz v. State*, 88 Neb. 613, 130 N. W. 105.

In the brief of the attorney general appears the following summary:

"It is true that the story is both bizarre and fantastic. * * * Nobody but people like Mrs. LeGrand and Mrs. Ruzicka could think of schemes like that which was perpetrated on Kubiceks. It is true that Mrs. LeGrand was a liar and a thief, or she wouldn't have been engaged in the scheme at all. It is true that ordinarily such a person is not worthy of belief and that a conviction on such testimony alone would ordinarily not be obtained. But the question, of course, was not whether she is worthy of belief generally, but whether she told the truth in this case. All these questions as to her credibility were for the jury and not for this court, * * * the jury, of course, saw her on the witness-stand and observed her conduct and demeanor while testifying; saw the defendant and observed her; saw one of her witnesses perjure himself and then resume the stand to brand himself a liar, and decided that Mrs. Ruzicka did have a hand in this shocking theft.

"Mrs. Ruzicka knew that she had been told by Mrs. LeGrand that she lived near Lincoln, yet she withheld that fact from the sheriff when she knew he was looking for Mrs. LeGrand. She told the sheriff she had been forced to write the note to Kubiceks. There is evidence that she received $1,300 of the money. True, she says she didn't, but a witness, whom the jury apparently believed, says she did."

This very concise summary by the attorney general is supported by the evidence, and convincing in its conclusions. We must not forget that, while the defendant denied that Mrs. LeGrand handed her the package containing the $1,300, wrapped in rubber bands, as borrowed from the Geneva State Bank, yet the careful jury considered the fact that not one of the bills from that particular package,

of which all the numbers had been taken down, was ever found in the possession of Mrs. LeGrand, or the Stanleys, with whom she traveled to Spokane. The evidence is undisputed that the defendant told Mrs. LeGrand, who was an entire stranger in that community, that her cousin Mike had a cancer and had plenty of money, or could borrow it, and this valuable information, together with the seductive letter of introduction which the defendant voluntarily gave Mrs. LeGrand, furnished all the groundwork necessary for the successful larceny.

Now, having the evidence before us upon which the jury returned a verdict of guilty, what is the general principle of law governing the matter?

It is well stated in Corpus Juris, as follows: "It is the policy of the law that questions of fact shall be determined solely by the jury under the supervision of the trial court, and that the appellate court shall have nothing to do with the weight of the evidence on which a conviction is based." 17 C. J. 254.

This court has held: "In a criminal prosecution, the determination of the credibility of the witnesses and the weight of the evidence being peculiarly within the province of the jury, a verdict of guilty, based upon sufficient competent evidence, will not be disturbed, even though this court may entertain doubt as to the correctness of the jury's finding." *Burnett v. State,* 88 Neb. 638, 130 N. W. 263. See, also, *Carter v. State,* 98 Neb. 742, 154 N. W. 252; *Gerwick v. State,* 98 Neb. 69, 151 N. W. 982; *Ward v. State,* 58 Neb. 719, 79 N. W. 725.

"The basis of a jury's verdict is sufficient when the evidence affords any fair and reasonable ground upon which it may be sustained." *McCown v. Commonwealth,* 271 Ky. 265, 111 S. W. (2d) 389.

This case was carefully tried by an experienced judge, the jury were properly instructed, there was no prejudicial error in rulings on the evidence, and in my opinion, from an experience of 14 years as a district judge, this evidence amply sustained the verdict of guilty returned by the jury

in Fillmore county. I would, however, have made no objections to a reduction of the sentence to one year in the women's reformatory at York, because of the fact that the defendant is now upwards of 60 years of age.