JOSEPH R. BASKINS V. STATE OF NEBRASKA.

299 N. W. 188

FILED JUNE 27, 1941. No. 31120.

*Hoagland, Carr & Hoagland* and *Beeler, Crosby & Baskins,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Don Kelley,* contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

On April 10, 1938, plaintiff in error was convicted in the district court for McPherson county, Nebraska, on the charge of assault with intent to do great bodily harm, and sentenced to serve two years in the state penitentiary. He prosecuted error to this court, where the record of his trial and conviction was reviewed, resulting in an affirmance of the judgment. *Baskins v. State,* 138 Neb. 334, 293 N. W. 270.

The proceedings incident to the question to be determined need not be stated. Motion for a new trial was overruled and notice of proceedings in error filed. The only issue involved in this appeal is whether there was sufficient evidence to sustain the motion for a new trial on the ground of newly discovered evidence.

Two cases, decided by this court, contain the same transaction as appears in the instant case. *Macomber v. State,* 137 Neb. 882, 291 N. W. 674; *Hastings v. State,* 138 Neb. 365, 293 N. W. 236. The newly discovered evidence upon which plaintiff in error bases his contention for a new trial and its relation to evidence previously adduced at the former trial of *Baskins v. State, supra, Macomber v. State, supra,* and *Hastings v. State, supra,* and likewise its relation to statements taken in the county attorney's office, is hereinafter set out.

In June, 1940, by affidavit, one Claud Dailey swore, in substance, that he had contacted Albert A. Hastings at the request of Woodford E. Oliver, who testified in the original case as a witness for the state, and who was a roommate of the affiant; that Oliver wanted the sum of $125 from Hastings so that he could leave the country and not testify, and that Oliver had testified falsely at the previous trial; that Hastings refused to give any amount and asserted that Oliver had sworn to lies in the trial of the three different cases. Affiant then went to see Oliver and asked him what he had meant on Monday, November 22, 1937, when he had told him "that all he heard was a noise, such as putting a drunk to bed or putting a drunk out; that he had heard

none of the talk" occurring on the night of November 21, 1937, in a room near his own, where the offense was committed. Oliver also said that the victim of the assault, Sam I. Pappas, and Otto Dudschus, an investigator for the state, had induced him to testify to falsehoods by furnishing him with liquor and making promises to him.

In addition to the foregoing there is an affidavit by Oliver, who swore, in substance, that he testified in the three cases, hereinbefore mentioned, and had sworn to a state of facts that were not true; that he was coached by Sam I. Pappas and Otto Dudschus, was furnished liquor by them, and did not realize that he was testifying to an untruth that might result in men going to the penitentiary, and wished to correct the statement; that on Monday, November 22, 1937, he had talked with Claud Dailey, when Dailey asked him if there had been a fight there, and whether he had heard the fight and knew anything about it; that he told Dailey he did not know anything about a fight and had only heard a racket on the night of November 21, 1937, when the offense was committed, and at that time "did not know whether they were putting a drunk to bed or throwing a drunk out." He further stated that he was a cripple, in bad health, and that the testimony given by him in the three cases was untrue; he never heard any of the talk about which he testified; all he heard "was just a noise."

A statement by Oliver, taken by a stenographer in the county attorney's office on the afternoon of November 29, 1937, reflects the following: "Q. (31) Just go ahead and tell us in your own words what you heard from the time the door closed on the last persons going into the room. A. I heard a commotion and it sounded like they were scuffling or fighting and then somebody rushed to the door and got out the door, and the way it sounded to me, somebody pulled him back and he said: 'Sit down, you * * * I'm running this, not you—I'm boss around here.' " "Q. (41) What else did you hear? A. Well, it seems to me like I heard whoever this was say, 'Don't Curly, don't do that.' Q. More than once? A. Yes; he repeated it. Q. Did the party saying

'Don't Curly' seem to be in pain? A. It seemed to be in a pleading voice." "Q. (57) Was there any reference made to hitting there in the room? A. I heard 'Don't Curly, don't do that, don't hit me again.'"

The following is from the testimony of Sam I. Pappas: "Q. (109) Did you have any conversation with Woodford E. Oliver, or Woody Oliver, regarding any of the testimony which he was to give in any of the three cases growing out of that alleged crime? A. Never."

Oliver testified, in substance, as follows: "Q. (319) Now, I will ask you if Sam I. Pappas ever, in any way, instructed or coached or drilled or discussed with you, your testimony that you were going to give in any of these cases? A. He never did; no." "Q. (325) I will ask you if, at the time, you told (the county attorney) and myself the same story that you gave a written statement to (the county attorney) and the stenographer a few days later? A. Yes." We have heretofore set out the substance of such statement. "Q. (328) Do you know Otto Dudschus? A. Yes, sir. Q. I will ask you if you ever, at any time, told him what you were going to testify to in any of these three cases? A. I never did." "Q. (334) Now, I was going to ask you, generally, if the facts which you stated in your testimony in the case of State against Baskins, and in the other two cases here, those which you testified to under oath, during those trials are the truth? A. Yes, sir. * * * Q. This affidavit exhibit 5 (heretofore referred to in substance) is a falsehood? A. Yes." "Q. (341) And what are the facts as (to) whether or not Sam I. Pappas or Otto Dudschus or anybody else connected with the State's side of the case furnished you with liquor? A. No; they never did." Oliver denied he had the conversation with Dailey as sworn to by Dailey; what Oliver said, in substance, was: "Claud came home that night about one o'clock—Q. (345) The same night of the fight? A. Yes, the same night it happened, and said: 'Who rooms across the hall.' I said, 'I don't know.' I said to him, 'Well, they had a battle of some kind over there, it sounded like George (the night clerk) was putting some drunks to bed and he

might have took the worst of it.'" "Q. (349) The talk about 'Don't hold me Curly or hit me, Curly,' did you hear that or not? A. Yes. * * * Q. So, when you say in this affidavit that you never heard it, you lie, don't you? A. Yes." Witness then testified as to the affidavit, exhibit 5, how it was obtained from him, saying that he was under the influence of liquor; that the affidavit had been prepared and read to him, and that when he signed it he was paid the sum of $100 by one Charley Pierce; that Pierce said Oliver should give him a note, so it would look as if the money had been borrowed. On cross-examination he testified in question 492 substantially as he testified in question 31, *supra*.

In the case of *Hastings v. State, supra,* the record reflects that the witness Oliver testified, in substance: "Q. Did you hear any other talk or words there after that time? A. Yes; after this commotion, why, he said, 'Sit down, you * * * I am running this, not you,' and he set down, and then he said, something about 'Don't hit me again, Curley, don't hit me again.' Q. Did you hear any more conversation after that time? A. No; I don't believe that I did. Q. Was anything there said about holding him— * * * A. Not that I remember of." Cross-examination: "Q. Then the next thing you heard was, 'Don't hit me Curley, don't hit me again?' A. Don't hit me again." (*State v. Hastings,* B. of Ex. pp. 778, 779, 786.)

In the case of *Macomber v. State, supra,* the witness Oliver testified, in substance: "Q. Did you hear any other voices say anything to that? A. He said, 'Don't hold me Curley, don't hit me again.' Q. 'Don't hold me Curley, don't hit me again?' A. Yes." Defense counsel on cross-examination: "I am asking you whether or not when they questioned you here and asked you and you testified on the former trial of this case—let me ask you whether or not at the time of the Hastings' trial you didn't testify that the conversation was, 'Don't hit me Curley, don't hit me again?' * * * A. He said, 'Don't hold me Curley, don't hold me again.'" (*State v. Macomber,* B. of Ex. pp. 661, 664.)

In the trial of the case of *State v. Baskins* the witness

Oliver testified: "Q. What was done—what was the tone of the voice that said, 'Don't hold me Curley, don't hit me again?' A. It was kind of a pleading tone." (*State v. Baskins,* B. of Ex., p. 849.)

"The granting or refusal of a new trial rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed unless there has been a clear abuse of such discretion. And, also, in the exercise of this discretion the courts have always listened distrustfully to the claim of newly discovered evidence, and as a ground for a new trial it is not favored." *Lee v. State,* 124 Neb. 165, 245 N. W. 445. See 23 C. J. S. 1224, sec. 1453.

The plaintiff in error refers to the cases of *Macomber v. State, supra,* and *Hastings v. State, supra.* A review of the decisions clearly discloses that the cases were reversed and remanded on an entirely different legal proposition than that contended for by plaintiff in error in the case of *Baskins v. State, supra.* In the latter case, it was contended and argued that defendant Baskins did not strike Pappas and did not intend to inflict great bodily injury, and that these elements of the felony charged were not proved.

As a member of the city council and chairman of the police committee, Baskins was the superior of Macomber, a patrolman, saw the assault from the beginning to the end, and did not stop it. There is evidence that Baskins and Hastings held Pappas while Macomber made the assault and thus aided in the commission of it. The law is: "Whoever aids, abets or procures another to commit any offense may be prosecuted and punished as if he were the principal offender." Comp. St. 1929, sec. 28-201.

In the opinion in *Baskins v. State, supra,* the court said: "Every element of the felony charged was clearly proved and the jury were justified by the evidence in finding Baskins guilty beyond a reasonable doubt." The record in *Baskins v. State,* as well as the opinion, discloses that, even in the absence of the testimony of Oliver, the other evidence was sufficient to sustain the verdict.

A motion for a new trial for newly discovered evidence

will not be granted where the other evidence is sufficient to sustain the verdict. The newly discovered evidence offered in the instant case is of an impeaching character, to discredit the witness who testified at the trial. In 23 C. J. S. 1248, sec. 1460, it is said: "Generally, a new trial will not be granted for newly discovered evidence which, when produced, will merely impeach or discredit a witness who testified at the trial." See, also, *Ogden v. State,* 13 Neb. 436, 14 N. W. 165; *Kenyon v. State,* 111 Neb. 175, 196 N. W. 143. The affiant Dailey, who heard Oliver's story on the morning of November 22, 1938, could have given the same impeaching testimony at the trial. This discloses a lack of due or reasonable diligence on the part of the accused. See 23 C. J. S. 1250, sec. 1460.

Obviously, the witness Oliver recanted. In *People v. Shilitano,* 218 N. Y. 161, 112 N. E. 733, it was said in the opinion (p. 170) : "There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character."

The question for our determination is whether recantation by a witness, who testified on behalf of the state, necessarily requires the court to grant the defendant a new trial, and, as said in *Blass v. People,* 79 Colo. 555, 247 Pac. 177: "We must answer the question in the negative. Such a rule would imperil the proper administration of justice. (Citing *People v. Shilitano, supra.*) The power to grant a new trial to a convicted felon would no longer rest in the sound discretion of the court, but with the witness who testified against him upon the trial."

The plaintiff in error refers in his brief to the second trial in the district court of *State v. Macomber* and *State v. Hastings,* tried subsequently to the overruling of the motion for a new trial for newly discovered evidence in the instant case, perhaps in the thought that we should take judicial notice of the result of such cases under the circumstances. If this be true, the contention is definitely without merit.

AFFIRMED.