KENNETH C. RAINS, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

114 N. W. 2d 399

Filed March 30, 1962. No. 35140.

*Kelly & Kelly* and *Harry S. Grimminger*, for plaintiff in error.

*Clarence A. H. Meyer*, Attorney General, and *Cecil S. Brubaker*, for defendant in error.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is a criminal action brought in the district court for Hall County against Kenneth C. Rains, defendant, under the provisions of section 28-504.02, R. R. S. 1943, charging that on or about May 9, 1959, in Hall County, Nebraska, Kenneth C. Rains did unlawfully, willfully, and maliciously set fire to and burn, or cause to be burned, a certain building situated in Doniphan, Nebraska, the property of Ivan Yates and Grace Ann Yates, in which there was a contractual interest running to Howard Jones. Change of venue was granted to try the case in Howard County. The jury returned a verdict finding the defendant guilty. The defendant was sentenced to a term in the Nebraska State Penitentiary. The defendant filed a motion for new trial which was overruled. The defendant brought this case to this court for review.

The defendant contends that the trial court should not have permitted this case to go to the jury for the reason that there was insufficient evidence to convict the defendant, therefore, the trial court should have sustained the defendant's motion for dismissal of the case.

We will refer to Howard Jones as Jones, to Kenneth

C. Rains as the defendant, and to the other witnesses by their last names or title, or on occasion, when it is preferable, will use the first and last names.

The testimony of Jones is in substance as follows. Jones lived at Eldon, Missouri, and had been engaged in the automobile business, and finally in the grocery business at Doniphan, Nebraska. He purchased the grocery business from Ivan and Grace Ann Yates on December 4, 1958, by a written agreement to purchase the real estate and personal property in the grocery store for the amount of $7,500. Jones testified that this money came from Jungclaus and the defendant. He further testified that he did not recall when he first met the defendant, but that he had become better acquainted with him in September 1958, and saw him quite frequently in September and early October 1958; that he became acquainted with Jungclaus through the defendant at Tulsa, Oklahoma, the last part of October or the first part of November 1958; that he and the defendant went to Tulsa, Oklahoma, in the defendant's car; and that they met Jungclaus and remained there for 2 or 3 days. The defendant introduced Jungclaus to Jones as a groceryman and a good friend from Grand Island, Nebraska. Jones left Tulsa in the Jungclaus car, and the defendant and Jungclaus told him to go to a certain hotel in a town in Arkansas, and they would meet him there. All three of them stayed at the hotel. Jones left the Arkansas town in the Jungclaus car. The defendant and Jungclaus followed him in another car to Eldon, Missouri. Jones again saw Jungclaus and the defendant sometime between November 5 and November 8, 1958. The defendant told Jones that he and Jungclaus had talked it over, and that they would get a business somewhere, would buy it, and Jones could run the business. Two or 3 weeks later the defendant saw Jones in Eldon and said he had talked to Jungclaus and Jungclaus wanted Jones to go to Nebraska and Jungclaus would fix Jones up in some kind of business or employment.

Jones stated that after he had this conversation with the defendant he went to Grand Island in December 1958, and got in touch with Jungclaus. On December 4, 1958, he signed the contract for the purchase of the store at Doniphan. After he signed the contract, he saw the defendant in Grand Island. Jungclaus explained to the defendant how the store was purchased. The defendant said he would come up with his part of the money. Jones stated that the defendant kept bragging the store up, said it was a good spot, that it would make money, and for Jones not to worry about it. Jones went to Missouri, and on the Saturday night after Christmas the defendant went to see him and asked Jones why he left Nebraska. Jones replied that he went home for Christmas. The defendant told Jones to get back to Nebraska or they would lose $1,000 on the contract. Jones told the defendant he would probably go to Nebraska the next day. The defendant told Jones to meet him at his place in Eldon and he would accompany Jones to Nebraska. Jones left Eldon in his car and the defendant followed in his car. When they arrived at Grand Island, they went straight to the Jungclaus home. They stopped their cars, and the defendant told Jones to go in and have Jungclaus come out. The three of them talked together, and the defendant said to Jungclaus: "* * * we got up here all right finally * * *." Jungclaus said to Jones: "I thought you had run out on us and wasn't coming back up here."

Jones took over the store in Doniphan on January 1, 1959, at 6 p.m. The inventory had been taken that day. Jungclaus, Jones, and the defendant were all at the store that morning with the owners of the store, Mr. and Mrs. Yates, and other help. The defendant did not remain in the store all day, but left and returned before the inventory was completed. After Ivan Yates had run the figures with reference to the inventory, he told them the exact amount, and said he wanted his money. Jungclaus said the money would be there

in the morning, and told Jones to give Ivan Yates a check. The defendant said to Ivan Yates: "You needn't worry, we will have the money in the morning." Jones gave Ivan Yates a check for the amount of the inventory. Jones stated that after he gave Ivan Yates the check, he received the keys to the store. Jungclaus and the defendant were present at that time. Jones gave Ivan Yates another check for the petty cash. After that, Jones, Jungclaus, and the defendant walked out of the store together, and Jones started to Grand Island in his car. Jones, Jungclaus, and the defendant met at a restaurant on the way back to Grand Island that evening, and Jungclaus told Jones to meet him and the defendant at Jungclaus' office in his home the next morning and he and the defendant would get Jones the money to put in the bank to take care of the check. Jones went to the Jungclaus residence and met Jungclaus and the defendant. Jungclaus and Jones first went to the bank together and returned, and Jungclaus and the defendant visited privately for a few minutes. The defendant received a check from Jungclaus and told Jones that they were going to the bank together. The defendant cashed the check at one bank and gave the cash to Jones and told Jones to deposit it, together with $3,000 that Jungclaus had given Jones, in another bank. Jones deposited the cash in an account for Jones IGA Store. The check Jungclaus had given to the defendant was signed by Jungclaus, made out to the defendant as payee, and endorsed "Cash Loan to K. C. Rains."

Jones stated that during the following 2 weeks he saw the defendant almost every night, when the defendant came to the store about the time Jones was ready to close the store; that after January 2, 1959, the defendant talked to him about the operation of the store when the defendant was present in the store after the help had left; that Jones told the defendant it looked like the bills were getting too big and he did not know how he was going to pay them; and that the defendant said he would

get some more money to put into the business. The defendant said he did not want his name on any paper connected with the store, and that he would give Jones the cash to pay the bills. The defendant told Jones not to worry about the operation because "we are going to burn it." The defendant said he would "get this ready and I will have to go back to Missouri because I have had too many fires, and I can't be here when it burns as I will be suspicioned (sic)." After this conversation was finished, Jones and the defendant went to Grand Island and had something to eat. The next time this matter was discussed with Jones was a week or 10 days later. Jungclaus and the defendant were present at the defendant's apartment in Grand Island. The defendant told Jones not to worry about it, he and Jungclaus would take care of the burning part. Jungclaus said he would do the burning and that the defendant would have to be at home when this happened. At the same meeting the defendant said that after this deal was cleaned up, the three of them would have $30,000 insurance money to split. Jones did not see the defendant in Nebraska from the last part of January or the first part of February 1959, until after May 9, 1959.

Ivan Yates testified that Jungclaus introduced Jones to him; that the inventory was taken and settled for; that Jones, Jungclaus, and the defendant, together with Mr. and Mrs. Yates and Harold Roach, were present at the time the inventory was taken; that Jungclaus introduced the defendant as an associate of Ernie Jones of Eldon, Missouri, who was supposed to be a brother of Howard Jones; that while the inventory was being completed, the defendant was somewhere around the store and had been there all day; that after January 1, 1959, he saw the defendant in Doniphan possibly half a dozen times, once or twice in the store; and that the Jones IGA Store in Doniphan burned in the early morning of May 9, 1959.

Evers testified that he was a clerk in the Jones IGA Store, hired by Jones and Jungclaus. He went with Jungclaus in the early morning of May 9, 1959, from Grand Island to Doniphan, and the two of them entered the Jones IGA Store building using a key Jungclaus had. They stayed in the store about 15 minutes. Jungclaus then went back and stayed a few more minutes. The two of them then drove west a block, south a block, then back on Highway No. 281 east toward Grand Island. At an intersection a block east on the highway they looked toward the store and saw a fire. They then went on to Grand Island where Evers took Jungclaus to the hospital because he had been burned. Later that morning Evers again saw the store and it was almost entirely burned. Evers had known of the plan to burn the store since he was hired some 3 weeks before the fire, when Jungclaus told him of the plan.

Insurance policies on the store and the contents purchased from the former owner, Yates, had been assigned to the new owner, Jones. Three additional insurance policies were purchased covering this same store and contents, one by Jungclaus and two by Jones. The aggregate amount of these insurance policies was $36,700.

Geraldine Creason testified that she worked for Jones as a clerk in the grocery store at Doniphan, Nebraska; that she had seen the defendant in the store three or four times while she was working for Jones; and that when the defendant came into the store he looked the store over.

The defendant testified that he was engaged in the business of selling liquid petroleum products at Eldon, Missouri; that prior to 1954, he lived in Grand Island and engaged in the same business; that he became acquainted with Jungclaus in 1941; that he and Jungclaus were planning on a burglar alarm sales proposition but this did not go through; that while he lived on a farm north of Grand Island, he and Jungclaus fed some cattle; that Jungclaus came to Eldon, Missouri, during the sum-

mer of 1958 with his family; that Jungclaus told the defendant that he was manufacturing burglar alarms at Grand Island and he wanted the defendant to go to Grand Island and help sell this product due to the fact that the defendant was well acquainted over the state; and that the next time he saw Jungclaus was in Tulsa, Oklahoma. This witness further testified that he had known Howard Jones since 1957; and that he saw Jones in Tulsa, Oklahoma, when Jungclaus was there. He further testified that Jungclaus came to Eldon, Missouri, prior to November 1958; that Jones was living in or near, and working in Eldon, Missouri, in 1957, and was driving cars for Ernie Jones who was engaged in the automobile business; that Ernie Jones' business was directly across the street from the motel of defendant's wife; and that in connection with the motel there was a restaurant. The defendant further testified that he saw Jungclaus and Jones together in Eldon in the fall of 1957 and at different times during 1958; and that he went to Grand Island 2 days before January 1, 1959, primarily on a business trip with reference to the burglar alarm business, and to visit his son and daughter-in-law who resided on a farm near Grand Island. The defendant testified that he located Jungclaus who told the defendant that he was going to take an inventory at a store in Doniphan on New Years Day; that he saw Jungclaus in Doniphan on January 1, 1959, when he went to the store in the morning; that he remained there until about 1:30 or 2 p.m.; that while he was in the store he said a few words to Yates, but did not discuss business with Jungclaus with reference to the burglar alarms because Jungclaus was busy taking inventory of the store; that he drove to his son's home for dinner and returned to Doniphan at approximately 5 or 5:30 p.m., and went to the store; that he did not engage in any conversation with Yates, Jungclaus, or Jones about the matter or quantity of the inventory, nor about the payment for the inventory; that he had no interest in what was known

as the Jones IGA Store; and that he was in the store when the transaction was completed. The defendant further testified that he endorsed a check for $2,000 for Jungclaus as an accommodation because Jungclaus' wife was not to know about Jungclaus investing in this particular business, which was the reason why the check was made to the defendant, endorsed by him, and given to Jones. The defendant further testified that he at no time borrowed this money from Jungclaus, nor was it ever money that he had put up to become a partner in the store. The defendant further testified that he left Grand Island on January 14, 1959.

Jerry Bock testified that he lived in Eldon, Missouri; that he was engaged in the filling station business; that he met Jungclaus at Eldon in June or July 1958; and that Jones introduced this witness to Jungclaus in July 1958.

Elena May Oliver testified that she lived in Eldon, Missouri, and was employed by the defendant's wife at the Randel Motel; that in connection with the motel there was a restaurant; that she became acquainted with Jungclaus in July 1958, when he and his family were registered at the motel; that she was acquainted with Jones who was in and out of the restaurant quite often; that she first met Jones early in 1958, when she went to work in the motel; that while she worked at the motel she saw Jungclaus and Jones together in the restaurant several times; that she also saw Jungclaus and Jones together in Eldon in October or early November 1958; and that during the visits of Jungclaus in the latter part of October or first part of November 1958, she had an occasion to hear a conversation between Jungclaus, the defendant, and the defendant's wife in the defendant's apartment in the motel, to the effect that Jungclaus wanted the defendant to come to Nebraska and sell burglar alarms. She further testified that she terminated her employment at the motel the last part of January 1959.

The defendant introduced evidence of four witnesses who lived in the vicinity of Eldon, Missouri, were acquainted with him and friends of his, and who testified to the defendant's reputation for truth and veracity as being good.

In Jungclaus v. State, 170 Neb. 704, 104 N. W. 2d 327, this court said: "A conviction may rest on the uncorroborated testimony of an accomplice when, considered with all the testimony and circumstances, it satisfies the jury beyond a reasonable doubt of the guilt of the accused." See, also, Ruzicka v. State, 137 Neb. 473, 289 N. W. 852.

In Millslagle v. State, 137 Neb. 664, 290 N. W. 725, the case of Jahnke v. State, on rehearing, 68 Neb. 181, 104 N. W. 154, was referred to, wherein it was said: " 'The evidence of an accomplice should be closely scrutinized. If it appears that such witness has wilfully sworn falsely in regard to a material matter upon the trial, his evidence cannot be sufficient, if uncorroborated, to support a verdict of guilty.' * * * To the extent that Jahnke v. State, *supra*, appears to declare that a conviction resting upon the uncorroborated evidence of an accomplice, who has been guilty of a conscious falsehood on a material matter, will in every case be set aside as a matter of law, it is modified to conform to the views herein expressed."

A clear explanation of the views expressed in Millslagle v. State, *supra*, with reference to Jahnke v. State, *supra*, is expressed in Smith v. State, 169 Neb. 199, 99 N. W. 2d 8, as follows: " 'The fact that an accomplice has been guilty of wilful false swearing on a material matter is a circumstance that may possibly, in a particular instance and situation, make his testimony unworthy of belief on its face, if it lacks corroboration. In the ordinary case, even though the accomplice may have been guilty of a conscious falsehood on a material matter, and even though his testimony is lacking in corroboration, it may not be utterly unworthy of belief on its face, and,

in such a situation, the rights of an accused will be adequately protected if the jury are instructed that the testimony of an accomplice should be scrutinized closely for possible motives for falsification, and that where he has wilfully sworn falsely in regard to a material matter they should be hesitant to convict upon his testimony, without corroboration, and that in no case should they convict unless they are satisfied from the evidence, beyond a reasonable doubt, of the guilt of the accused.' It is therefore not now the law of this state that one charged with a criminal offense may not be convicted on the testimony of an accomplice."

Without repeating the evidence in this case, it does show that the defendant was in the store in the early part of January 1959, and that Jungclaus introduced the defendant to Yates as an associate of Ernie Jones who was furnishing the money for his brother Howard Jones to purchase the store. There is no explanation given by the defendant for his presence in Doniphan and at the store at times other than when the inventory was taken. The defendant was present at the time the inventory of the store was finished. The defendant admitted the cashing of the check marked "Cash Loan to K. C. Rains," but claimed it was an accommodation to Jungclaus. We make reference to other evidence as heretofore set out.

This court said in Smith v. State, *supra:* "Definitive of what is meant by corroboration, it was said in Heusser v. McAtee, 151 Neb. 828, 39 N. W. 2d 802: 'Where there is a direct conflict in the evidence relating to a material issue, any collateral fact or circumstance tending in any reasonable degree to establish the probability or improbability of the fact in issue is relevant evidence and admissible for consideration of the jury.' This statement does not employ the terms 'corroboration' or 'corroborative' but the opinion points out that the statement was a characterization of these terms."

The evidence upon which the case was tried was suffi-

cient to go to the jury, and sufficient for the jury to return a verdict of guilty. The trial court did not commit error in this respect as contended for by the defendant.

The defendant contends that the trial court erred in not permitting the defendant to take the depositions of Jungclaus and Jones who were confined in a penal institution. The defendant filed a motion in the trial court requesting the court to grant the taking of the depositions of the two above-named persons who were held in confinement. This motion was supported by an affidavit to the effect that the nature of the crime charged was such that it would be necessary for the defendant to ascertain various times, dates, and places which allegedly would be testified to by one or both of the witnesses (Jungclaus and Jones) in order to properly defend himself of the crime charged. We fail to find that this motion was ruled upon by the trial court. This being true, it is proper to assume that the motion was overruled.

While some discussion is made in the briefs of the defendant and the State of sections 29-1904 and 29-1905, R. R. S. 1943, it is unnecessary to analyze these sections with reference to this issue.

Section 25-1233, R. R. S. 1943, is applicable to the instant case. This section provides: "A person confined in any prison in this state may, by order of any court of record, be required to be produced for oral examination in the county where he is imprisoned; but in all other cases his examination must be by deposition." Therefore, the depositions of persons confined in penal institutions may be taken in a criminal action.

In the instant case the showing made by the defendant to the trial court to procure an order to take depositions of the witnesses heretofore mentioned is inadequate and insufficient. There is no showing as to what material evidence would be adduced by the witness Jungclaus in behalf of the defendant relating to the defendant's de-

fense if the motion to take his deposition was granted. In a situation of this kind, the question is whether or not the trial court abused its sound legal discretion in not permitting the defendant to take the depositions as set forth in his motion. We conclude that under the circumstances as presented by the record the trial court did not abuse its sound legal discretion as contended for by the defendant.

The defendant contends that there was irregularity and misconduct on the part of the county attorney by causing subpoenas to be served upon two witnesses for the defense; and that by virtue of this action the county attorney sought to harass the witnesses for the defense.

Jerry Bock, a witness for the defense, was served with a subpoena to appear as a witness for the prosecution, and a subpoena was served on Ernie Jones, also a witness for the defense. The latter witness was used as a rebuttal witness for the State. Jerry Bock's testimony is to the effect that no one from the county attorney's office ever talked to him about being a witness or inquired of him what kind of testimony he might give on behalf of the State, nor was any attempt made to use him as a witness for the State. No specific objection to the action of the county attorney in having these subpoenas served was made by the defendant.

In Ossenkop v. State, 86 Neb. 539, 126 N. W. 72, this court said: "In a criminal prosecution, rebuttal testimony on behalf of the state may be given by witnesses whose names were not indorsed on the information."

If, as contended for by the defendant, the action taken by the county attorney was for the purpose of harassing and confusing these witnesses for the defense it would not be an irregularity, but would be misconduct on the part of the county attorney.

In Goldsberry v. State, 92 Neb. 211, 137 N. W. 1116, it is said: "Objection that the prosecuting attorney is guilty of misconduct at the trial prejudicial to defend-

ant must be taken at the time. It is primarily a question for the trial court. * * *."

The record fails to disclose any showing by the defendant of any action that in any way prejudiced any right of the defendant because of the service of these two subpoenas. The defendant's contention is without merit.

The defendant contends that the trial court should have sustained the defendant's motion for a new trial on the ground of newly discovered evidence. This is based on the evidence of one Mills, who purchased the Randel Motel from the defendant's wife, and of the defendant's wife to an alleged telephone conversation between Howard Jones and the defendant, overheard by Mills and the defendant's wife, to the effect that Jones could clear the defendant of the offense charged against him if the defendant would give Ernie Jones $3,500. There is other evidence to the effect that Jones repudiated his evidence given at the trial of this case; that he told a witness he implicated the defendant on the belief that he could obtain a parole; that he alone could clear the defendant of the charge but it would take money; and that he had sent word to the defendant to get the money to Ernie Jones. There are also affidavits of two persons to the effect that Jungclaus and Jones were seen together prior to the date that Jones claimed he met Jungclaus.

The county attorney testified that Jones appeared before the Board of Pardons of the State of Nebraska. This witness testified that he appeared before the board at the hearing for Jones in his official capacity; that he made Howard Jones no promises of any kind; and that the only remark he made was that if Jones came up for parole, this witness would not do anything to stop him. The transcript of the proceedings before the Board of Pardons discloses no exertion or special effort on the part of the county attorney to reward Jones for his testimony given for the State.

In Fugate v. State, 169 Neb. 434, 99 N. W. 2d 874,

this court said: "The granting or refusing of a new trial on the ground of newly discovered evidence rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed unless there has been a clear abuse of such discretion." See, also, Smith v. State, *supra*. The court went on to say: "It is the rule that a new trial will not be granted on the ground of newly discovered evidence when the only effect of the evidence is to impeach or discredit a witness. Baskins v. State, 139 Neb. 803, 299 N. W. 188."

From a review of the affidavits and the evidence relating to the defendant's motion for a new trial on the ground of newly discovered evidence, it is concluded in this case that the trial court did not abuse its discretion in refusing to grant a new trial on the ground of newly discovered evidence.

The defendant contends that the trial court did not properly instruct the jury on the law as it relates to accomplices.

In support of this contention, the defendant asserts that the trial court gave but one instruction to the jury relating to the testimony of accomplices, which is instruction No. 16. This instruction reads as follows: "You are instructed as a matter of law that the fact that a person is an accomplice in a commission of a crime goes to his credibility as a witness, and an accomplice is not entitled to the full credit given to the other witnesses. You will receive such testimony with caution, closely scrutinize it in the light of all the other evidence in the case, and give it such weight as you may think it is entitled to have."

The defendant asserts that in Jahnke v. State, *supra*, the court held as follows: "The evidence of an accomplice should be closely scrutinized. If it appears that such witness has willfully sworn falsely in regard to a material matter upon the trial, his evidence can not be sufficient, if uncorroborated, to support a verdict of guilty." The defendant asserts that the trial court in

failing to instruct the jury about the fact that if a witness willfully swears falsely in regard to a material matter upon the trial, that the evidence cannot be sufficient, if uncorroborated, to support a verdict of guilty, does not give the jury the correct statement of law. The defendant also asserts that the trial court did not go far enough in its instruction as to the weight and credibility that should be given to an accomplice as set forth in Jahnke v. State, *supra*. Therefore, the defendant asserts that the trial court committed prejudicial error in giving instruction No. 16.

It has been pointed out heretofore in the opinion that the rule in Jahnke v. State, *supra*, has been modified.

In instruction No. 18, the trial court instructed as follows: "If you believe from the evidence that any witness has wilfully testified falsely as to any material fact in this case, then you are at liberty to entirely disregard the testimony of any such witness, except such portions as are corroborated by other creditable witnesses or evidence."

In instruction No. 19, the trial court instructed as follows: "If the evidence introduced in this case produces in your mind an abiding conviction of the guilty (sic) of the defendant and satisfies you of his guilt beyond a reasonable doubt, it is then your duty to convict him."

The following are applicable to the above contention of the defendant.

"Where the charge to the jury, considered as a whole, correctly states the law, the verdict will not be reversed merely because a single instruction, when considered separately, is incomplete." Kirkendall v. State, 152 Neb. 691, 42 N. W. 2d 374. See, also, Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151.

In Smith v. State, *supra*, this court said: "Where the trial court has instructed generally as to the issues of a criminal prosecution, error cannot be predicated on its failure to instruct as to a particular phase of the case,

where no proper instruction has been requested by the party complaining." See, also, Martin v. State, 67 Neb. 36, 93 N. W. 161; Welton v. State, 171 Neb. 643, 107 N. W. 2d 394.

The defendant did not request an instruction relating to the testimony of an accomplice in the case at bar. The trial court did not commit prejudicial error as contended for by the defendant.

Other assignments of error made by the defendant are without merit and need not be discussed.

The verdict of the jury and the judgment rendered thereon should be, and are, affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.