### HAWK v. HANN, Warden.

#### Civ. 23-51.

United States District Court
D. Nebraska, Lincoln Division.
March 11, 1952.

---

Richard W. Smith, Lincoln, Neb., for petitioner.

Robert A. Nelson, Asst. Atty. Gen. of Nebraska, for respondent.

DONOHOE, Chief Judge.

Petitioner, Henry Hawk, an inmate of the Nebraska State Penitentiary, transmitted to this court an application for a writ of habeas corpus. The application, crudely prepared by petitioner in his own handwriting, contained an affidavit of poverty and a request to proceed in forma pauperis. Since petitioner alleged, among other things, facts indicating his incarceration in violation of the Constitution of the United States, this court assumed jurisdiction, 28 U.S.C.A. § 2241 et seq., granted petitioner's request to proceed in forma pauperis, and appointed counsel to represent him. Sometime thereafter court appointed counsel filed an amended application for

the writ, a show cause order issued, and the Warden of the State Penitentiary responded.

#### Exhaustion of State Remedies

Petitioner, in custody pursuant to a judgment of a state court, is obviously aware of requirement that all state remedies must be exhausted before his application for habeas corpus can be considered by this court. He played an important role in the establishment of the requirement. Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572; 28 U.S.C.A. § 2254; Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L. Ed. 761. He has made every effort to, and insofar as this court is able to discern from an examination of prior proceedings in which he has been involved, he has, at long last, exhausted his state remedies. His endeavors in this connection may be briefly summarized as follows:

Petitioner filed an application for a writ of habeas corpus in the district court for Lancaster County, Nebraska, alleging facts very similar to the facts alleged in this case. The district court denied relief without a hearing. The Supreme Court of Nebraska affirmed. Hawk v. Olson, 145 Neb. 306, 16 N.W.2d 181. The Supreme Court of the United States granted certiorari, 324 U.S. 839, 65 S.Ct. 1021, 89 L. Ed. 1402, and reversed on the merits, pointing out that petitioner had stated the violation of a federal constitutional right and was entitled to a hearing. Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61. The petitioner then submitted a motion to the State Supreme Court requesting that the judgment of the United States Supreme Court be enforced and that the State Supreme Court issue a mandate to the district court for Lancaster County to issue a writ of habeas corpus directing that petitioner be produced before it for a hearing upon the allegations in his petition for the writ. The motion was denied. Hawk v. Olson, 146 Neb. 875, 22 N.W.2d 136. The State Supreme Court informed the United States Supreme Court that it misunderstood local procedure and pointed out that in Nebraska habeas corpus was not the proper remedy in the situation petitioner alleged. Since this decision of the Nebraska Supreme

Court rested upon a state procedural point, not involving any federal question, a request for certiorari was not a necessary step in the state remedy exhaustion process. White v. Ragen, 324 U.S. 760, 765, 65 S.Ct. 978, 89 L.Ed. 1348; Ex parte Hawk, 321 U.S. 114, 118, 64 S.Ct. 448, 88 L.Ed. 572. Petitioner then applied for a writ of habeas corpus here in the federal District Court for Nebraska but was informed that he must first try coram nobis in the State courts. Hawk v. Olson, D.C., 66 F.Supp. 195; affirmed in Hawk v. Jones, 8 Cir., 160 F.2d 807; certiorari denied 332 U.S. 779, 68 S.Ct. 44, 92 L.Ed. 363. Following these decisions, petitioner instituted a proceeding in error coram nobis in the district court for Douglas County, Nebraska, to vacate the judgment and conviction pursuant to which he was imprisoned. The allegations contained in the coram nobis petition are substantially similar to the allegations contained in the application for relief now under consideration. The district court held a hearing; evidence was adduced; and upon consideration of the merits, relief denied. The action of the district court was affirmed by the Nebraska Supreme Court, Hawk v. State, 151 Neb. 717, 39 N.W.2d 561; and the Supreme Court of the United States refused to grant certiorari. Hawk v. Nebraska, 339 U.S. 923, 70 S.Ct. 612, 94 L.Ed. 1346.

Indubitably no further remedies are available to petitioner in the courts of the state of Nebraska.

Effect of Denial of Certiorari

The significance of the denial of certiorari in a situation such as this, where the highest court of the state has considered petitioner's constitutional claims on the merits and ruled adversely to him, is very adequately explained in United States ex rel. Smith v. Baldi, 3 Cir., 1951, 192 F.2d 540, 541, by Judge Goodrich. At page 543 of 192 F.2d he remarks:

"Our narrower question is: What effect in the lower federal courts is to be given to the denial of certiorari by the Supreme Court? The Court, through Mr. Justice Reed, says, [Darr v. Burford] 339 U.S. at [page] 217, 70 S.Ct. at page 597, 94 L.Ed. 761: 'It is this Court's conviction that orderly federal procedure under our dual system of government demands that the state's highest courts should ordinarily be subject to reversal only by this Court and that a state's system for the administration of justice should be condemned as constitutionally inadequate only by this Court.'

"The doubt-creating word is 'ordinarily.' When should a district court and a court of appeals again examine merits? Our inclination would naturally be to say 'never.' It is highly uncomfortable for those of us in courts not of last resort to sit in what is, in effect, review of the highest court of a state. The responsibility is one from which we should be glad to be relieved. But Darr v. Burford does not say that denial of certiorari relieves us. The dissenting opinion * * * points out that no directions are given the lower federal courts on the point. It would be unseemly for us to make argument either way on the questions upon which our superiors differ. We think that what we clearly must do, until we are told to the contrary, is to follow the well established rule that a denial of certiorari does not prove anything except that certiorari was denied. When the applicant for habeas corpus has petitioned for certiorari he has fulfilled a procedural requirement. If he gets certiorari his constitutional questions will be adjudicated on the merits by the Supreme Court. If he does not, he may apply to the appropriate lower federal court for a writ. This seems to be the rule compelled, if not decided, by Darr v. Burford and considerations expressed therein.

"But it is to be reiterated that we are not an appellate court for the correction of errors under state law. Each point raised by the relator is to be tested by whether it alleges a violation of rights under the United State Constitution: nothing more. That these allegations have been decided on the merits by the highest state court is a fact to be given great weight by a district court in passing upon petitions for habeas corpus. But that fact does not relieve the federal court of the duty to pass upon the merits of the petition."

This very reasonable position seems to be the one adopted in our own circuit. Anderson v. Eidson, 8 Cir., 1951, 191 F.2d 989;

Goodman v. Lainson, 8 Cir., 1950, 182 F.2d 814. Consequently this court granted petitioner Hawk a hearing on the merits of the constitutional questions presented in his application for a writ of habeas corpus. After careful consideration of all the material and competent evidence adduced at this hearing the Court makes the following special

Findings of Fact:

The petitioner is a poor man whose formal education does not extend beyond the third grade. Prior to the time in question petitioner was involved in criminal and habeas corpus proceedings approximately seven different times. In all of these proceedings, except two, petitioner was represented by counsel. In those two, one a habeas corpus proceeding and the other a Dyer Act, 18 U.S.C.A. §§ 10, 2311–2313, prosecution in which a plea of guilty was entered and an appeal taken, petitioner represented himself.

On April 19, 1935, a complaint was filed in the municipal court of Omaha, Douglas County, Nebraska, charging petitioner in two counts with murder. The first count charged petitioner with murder in the first degree while attempting to rob Isadore Perelman on February 28, 1934. The second count charged petitioner with the first degree murder of Perelman by deliberately, with premeditated malice, shooting him with a revolver thereby causing his death.

Petitioner, who was at this time an inmate of the United States Penitentiary at Leavenworth, Kansas, serving a sentence upon a plea of guilty in the United States District Court in Nebraska for violation of the National Motor Vehicle Theft Act, became aware, evidently through one A. C. Anderson, that the complaint had been filed. From his prison cell, the petitioner transmitted the following letter, which was addressed to, and received by, Anderson:

"Post Office Box 7
        Leavenworth, Kansas Jan. 30–1936
"Mr. A. C. Anderson
    Police Station
        Omaha, Nebraska
"Dear Sir:—
    "Just a few lines in regard to our interview yesterday.

"I request of you to send me a Certified Copy of Information against me in District Court there before I consent to return to Omaha for trial.

"You must understand that if I do return to Omaha, that it must be of my own volition, For there is no law under the sun that you could or the State of Nebraska lawfully extradite me as a fugitive from Justice,

"First—I am not guilty of the charge and if and when I agree volintary to return to Nebraska, I will expect an early trial by Jury,

"Now if you or the agents of the State of Nebraska, Meet the above by a written agreement, of which I will approve, You may come down and let me see Your Authority or color of law under which you are acting and if agreeable, I will return in custody of federal officers but in no way am I to waive my constitutional rights. If I am acquitted I will return here to finish my legal sentence,

"I am just asking for a square deal and no more.

"Yours very Respectfully
"Henry Hawk
#45970—Box 7
"Leavenworth
Kansas

"P.S. 'Please keep this letter until after my trial.'"

On February 11, 1936, the petitioner was taken in custody from the penitentiary at Leavenworth, Kansas, to the Central police station in Omaha, Douglas County, Nebraska, pursuant to a writ of habeas corpus ad prosequendum, and at approximately two o'clock that afternoon a preliminary hearing was held. It appears that the petitioner actively participated in this hearing. At the beginning of the hearing he made an oral motion to quash the complaint on the ground that he was illegally brought into the state to plead; he made an oral motion to the court to require the county attorney to elect upon which charge of the complaint he would proceed to prosecute; and he demurred orally to the complaint on the ground that it did not state a crime. Rulings on these preliminary matters were all unfavorable to the petitioner.

142

During the course of the hearing the petitioner interposed objections to various interrogatories propounded by the public prosecutor and took the opportunity to cross-examine certain witnesses.

The transcript of the preliminary hearing contains the testimony of only four witnesses. Medical testimony concerning the death of Isadore Perelman and the cause thereof does not appear anywhere in the transcript. Whether this is because the transcript is incomplete or because no medical testimony was given is not too clear. The court is inclined to view the transcript as incomplete because petitioner asserts that a Dr. C. J. Toohey gave testimony at the preliminary hearing and a Dr. McCleneghan testified that he gave testimony at the preliminary hearing. The court reporter, whose shorthand notes of the preliminary hearing have been lost, does not deny the possibility that more than four witnesses appeared and gave testimony. In connection with this transcript it should be mentioned that only two witnesses, Eddie Nowicki and Paul De Santi, connected the petitioner in any way with the crime. A third witness, Paul Taylor, who had confessed to shooting Perelman and pleaded guilty to a charge of second degree murder, insisted that Hawk was not involved.

At the conclusion of the hearing, the municipal judge found that an offense had been committed and that there was probable cause to believe that the petitioner was guilty as charged. He was, therefore, bound over to the District Court of Douglas County to stand trial for murder in the first degree. This same day, February 11, 1936, the petitioner was returned, under guard, to the Federal Penitentiary at Leavenworth, Kansas.

On February 17, 1936, the information, containing the charges in the same language as the complaint, was filed in the district court. On February 20, 1936, the warden of the Federal Penitentiary at Leavenworth, Kansas, served upon the petitioner a copy of the information with a list containing the following witnesses endorsed thereon:

"Paul De Santi, 2029½ Pierce St.
Ben Barone, 2450 South 20th St.
James Farascio, 2204 So. 19th
Edward Nowicki, Douglas Co. Jail
James Reddon, 3009 Valley
John Wieczorek, 3009 Valley
Edward B. Nelson, 3023 Haskel
John Urzendowski, 2908 Deer Park
John W. Thorp, 3023 Haskel
Mrs. John W. Thorp, 3023 Haskel
James John, 3024 Grover
Edward Sobczyk, 3002 Vinton St.
Joseph Dergacyewski, 3018 Spring
Byron Thorp, 3023 Haskel
Sam Di Baise, 2919 Valley
Donald Moran, 2930 Deer Park
Paul Taylor
Dr. C. J. Toohey, Lord Lister Hospital
Frank Freeman, Police Officer
Fred Franks, Police Officer"

On March 1, 1936, the petitioner wrote a letter to Frank McGrath, clerk of the District Court. The letter contained the following list of witnesses, which the petitioner requested subpoenaed on his behalf:

"Mr. Marvin Casteel
Chief of Missouri State Highway Patrol
Jefferson City Missouri

"Mr. William Poage 'Lieutenant'
Missouri State Highway Patrol
Jefferson City, Missouri

"Mary A. Mullen
United States Commissioner
Federal Bldg.
Omaha, Nebr.

"Mr. Henry Meyers
U. S. Deputy Marshal
Federal Bldg.
Omaha, Nebr.

"Mr. J. O'Grady, Warden
Nebr. State Penitentiary
Lincoln, Nebr.

"Subpoena Due Tec Tum with the records of Edward Nowicki while confined in Nebraska Penitentiary from 1929 to and including 1933.

"Mr. Edward Wallace, 'Sheriff'
Maryville, Missouri."

The letter also requested the clerk to inform the petitioner as to the date of his trial.

Approximately March 2, 1936, the petitioner received a copy of the transcript of the testimony taken at the preliminary hearing. This transcript, which the county attorney transmitted upon request, contained the testimony of Nowicki, De Santi, Taylor and Fred Franks.

Four days later, the County Attorney wrote the petitioner advising him that pursuant to his request for an early trial, his case had been set for March 16, 1936. The county attorney, in his letter, suggested that the petitioner should obtain counsel, and, if he were unable to do so, the court would appoint the public defender to represent him.

On March 9, 1936, the court appointed the public defender to represent the petitioner. Although the public defender was notified of the appointment, there is nothing in the record to indicate that the petitioner was also informed, or even aware of, the appointment. The public defender, Joseph M. Lovely, who is now, and was at all times material to this case, a very able and competent lawyer with considerable experience as a defense attorney in criminal cases, took no immediate action, other than to examine the information, in preparation of the petitioner's defense. He did not prepare a trial brief, nor question the witnesses listed on the information, nor examine the transcript of the testimony taken at the preliminary hearing. In fact, he was evidently not even aware that such transcript existed. He considered it prudent to consult with the petitioner first, to obtain from him any information concerning a possible defense, and then proceed to make an investigation accordingly. The public defender understood that the petitioner would be in Omaha on the Saturday following the day of the appointment and the jailers were instructed by the public defender to notify him when the petitioner arrived.

On the 10th day of March, 1936, and on the 12th day of March, 1936, notices to Joseph Lovely and Henry Hawk, respectively, were filed by the prosecution notifying these parties that the prosecution would "apply to the District Court in Court Room #1 on the 16th day of March, 1936, or as soon thereafter as counsel can be heard, for permission to endorse, on the information in the above entitled cause State v. Hawk, the names of the following witnesses:

> "Dr. Samuel McCleneghan
> Ronald McDonald
> Fred J. Bruning
> Harry Rogers
> Erwin Henkley"

Such an application was never made to the District Court, and the District Court did not enter an order permitting the endorsement of said names on the information. However, the prosecution did endorse the above mentioned names on the information and did not serve a copy of the information with the additional names endorsed thereon upon the petitioner Hawk.

On Sunday, March 15, 1936, the petitioner was brought, under federal guard, to Omaha, and placed in an isolated cell in the Douglas County Jail. At approximately seven o'clock that evening the public defender and his assistant called upon the petitioner and notified him that they had been appointed by the Court to defend him. The petitioner in a cordial manner, told them not to bother, that he was going to handle his own case, and he refused to discuss his case with them. The petitioner asserts, in this connection, that it was his intention to employ in his defense one Dan Gross, an Omaha attorney; but that he was unable to contact Mr. Gross. After fifteen minutes of conversation in which little or nothing was said with respect to petitioner's case, the public defender and his assistant departed.

The next morning, the public defender appeared before the trial judge, the Honorable John W. Yeager, in chambers, and informed him that the petitioner did not desire the services of the public defender. The judge pointed out that "he was not going to have a man go to trial for murder without legal representation" and ordered the public defender to represent petitioner. The public defender then made it clear that he was not prepared to represent peti-

tioner and requested a continuance to prepare for trial. The judge refused the request. The petitioner, apparently not even present when the foregoing colloquy took place, was not consulted by the judge with respect to either the matter of legal representation or the matter of a continuance.

A short time later the public defender appeared in open court and presented a motion for a twenty-four hour continuance. The court overruled the motion and the public defender becoming "chagrined" left the court room.

In the absence of the public defender, the petitioner was brought into the court room and arraigned. He entered a plea of not guilty and orally moved for a twenty-four hour continuance. The court overruled this motion and ordered the parties to proceed with the selection of the jury.

In the interim, the public defender, upon the advice of his older brother with whom he had conversed outside of the court room, decided that it would be wise to return and take part in the trial. By the time he again took his place at the counsel table four or five jurors had been called to the box. Shortly prior to the public defender's return, John N. Baldwin, an Omaha attorney, appeared in the court room, introduced himself to the defendant and sat down at the counsel table. Mr. Baldwin had been paid a small sum, fifteen dollars to be exact, by one whom Baldwin insists was a friend of Hawk to report to Hawk the morning of the trial. Baldwin would not disclose the name of the friend. It is not material, however, because Baldwin admits that he was informed by Hawk that he would defend himself. Baldwin was neither retained by Hawk nor authorized by Hawk to act on his behalf. Baldwin at this time "knew not one single thing about the case except that there had been someone murdered and Mr. Hawk was accused with participation in the crime." Under these circumstances Mr. Baldwin, without informing the court as to the reasons for his presence, without having been present at the arraignment, and considering himself to have no responsibility for the defense of Hawk, took a position at the counsel table.

Confusion resulted. First, there seems to have been some disagreement between the petitioner, the public defender and Baldwin with respect to who should occupy the first chair at the counsel table. Secondly, the petitioner exhibited a desire to actively participate in his own trial by interposing objections and questioning witnesses. Upon observing these matters, the court informed the petitioner that counsel had been appointed to represent him; consequently, petitioner took the second place at the counsel table and was not permitted personally to object to questions or to examine or cross-examine witnesses. However, the confusion continued. The two men, who knew little or nothing about the case, proceeded to conduct, at least in a formal manner, the defense by interposing objections and examining witnesses. Their efforts in this respect were, because of their complete unpreparedness, almost entirely ineffectual. It is apparent that counsel were not even in a position to expose palpable inconsistencies in the testimony of prosecution witnesses because the petitioner was necessarily and persistently revealing, while witnesses were testifying, material facts relating to his case. With counsels' attention divided between the witnesses on the one hand and the petitioner on the other, it is little wonder that even the formal defense was completely frustrated.

During the course of the trial, petitioner made many suggestions relating to the conduct of his defense, but these suggestions were not always followed by the public defender who, aware of the responsibility that had been imposed upon him, was constrained to follow his own judgment. At times the petitioner complained to the trial judge that he was not being properly represented and in his opinion counsel were not doing things that should be done. The trial judge informed petitioner that counsel appointed to defend him were competent, and he would see that they properly represented him.

All in all, eighteen witnesses were called by the State to give testimony against the petitioner. The first witness, Fred J. Bruning, a police officer, had drawn, and produced at the trial, a plat showing the Perelman Grocery Store and the surrounding area, where the alleged crime was committed. Nothing in Bruning's testimony implicates the petitioner Hawk with the crime. Ten subsequent witnesses called by the State, Edward B. Nelson, Mrs. Pearl Knoieszka, Sam DeBose, Byron Thorpe, Mrs. John Thorpe, James Redoon, Donald Moran, John Urzendowski, Joseph Dargaczewski, and Edward Sobczyk, were allegedly at or near the scene of the crime at the critical time when Perelman was shot. These witnesses either denied seeing the petitioner or failed to testify on the point.[1]

A tavern keeper, Paul De Santi, testified to the following: Eddie Nowicki came to his tavern at 2510 Vinton Street on the evening of February 28, 1934, at about 6:30 p. m. and purchased a gun. Paul Taylor and petitioner were also in the tavern at this time, but De Santi did not see them talking to each other or to Nowicki. Nowicki, Taylor and petitioner left the tavern at about the same time, but not together. De Santi saw Nowicki and Taylor later that evening (after the time of the Perelman shooting) but did not recall seeing petitioner. Over objection by attorney Baldwin, the State impeached De Santi by showing that at the preliminary hearing De Santi had testified that he had seen all three men in the tavern both before and after the time of the crime.

Paul Taylor, the man who admittedly shot Perelman, testified that he went to the De Santi Tavern at about 6:30 p. m. on the evening of February 28, 1934, and while there had a conversation with Eddie Nowicki relative to a proposed robbery; that he left the tavern with Nowicki, who gave him a gun; that Nowicki drove him to within a short distance of the Perelman Grocery Store in Nowicki's car; that he left Nowicki in the car and proceeded on foot to the grocery store; that Isadore Perelman was just leaving the store; that when he was within a few feet of Perelman that he pulled out the gun intending to rob Perelman, but Perelman grabbed for the gun, a tussle followed, and the gun discharged; that when the gun discharged he ran to the car driven by Nowicki, jumped in, and the two of them fled from the scene of the crime. Taylor admitted that he knew Hawk, but denied that Hawk was involved in any way in the Perelman robbery and shooting. The State, without objection from defense counsel, proceeded to impeach Taylor's testimony by reading at length extra-judicial contradictory statements made to police officers on May 1, 1935, by Taylor, in which he relates in detail petitioner's alleged participation in the robbery. It is interesting to note in this connection that Taylor's testimony could hardly have surprsed the State, since his testimony at the trial was perfectly consistent with his testimony at the preliminary hearing and this hearing occurred quite some time after Taylor had given the contradictory statements to the police officers.[2] Neither the Public Defender nor Mr. Baldwin were aware of either the statement given to the police officers or the testimony given at the preliminary hearing. The police officers who had taken Taylor's statement, Captain Fred Franks and Charles Gieselman, were called by the State and testified to the circumstances surrounding the statement, i. e., that Taylor's answers to the questions propounded were given voluntarily under oath.

1. One of these witnesses, Joseph Dargaczewski, testified that he saw only one man running from the shooting and that he joined but one other man in the getaway car. Since Taylor admitted that he shot Perelman and Nowicki admitted driving Taylor to and from the place of the crime, Dargaczewski's testimony necessarily excludes the inference that petitioner participated in the crime. Another witness, John Urzendowski, testified that he saw two men running from the scene of the crime, one tall and one short. He testified that he believed the tall man was taller than Hawk. Taylor, however, is shorter than Hawk.

2. Nebraska seems to follow the general rule that in the absence of surprise the state is not entitled to impeach its own witness. Cf. Cornell v. State, 139 Neb. 878, 299 N.W. 231.

A Dr. McCleneghan testified that he had removed a bullet from the body of the deceased, Isadore Perelman; that in his opinion the bullet caused Perelman's death; and that he gave the bullet, which he marked with an "S", to one McDonald, a police ballistics expert.[3] McDonald testified that the bullet had been fired by a gun identified at the trial as Exhibit No. 5. This same exhibit had been identified by Sam DeBose as the gun handed to him by Perelman immediately after the shooting. The gun had also been identified by other witnesses as the gun sold by De Santi to Nowicki; given by Nowicki to Taylor; and taken from Taylor by Perelman.

The only witness to implicate petitioner Hawk in the crime was Eddie Nowicki, the accomplice. In response to questions, mostly leading and suggestive, propounded by the prosecution, Nowicki related his recollection of the crime. In his version Hawk was a full participant.[4]

When the evidence, briefly outlined above, had been presented, the State rested.

Counsel for the defendant did not submit a motion for a directed verdict of acquittal.[5]

A single witness was called by the defense. This witness, Henry F. Meyers, a deputy marshal (federal) gave testimony intended to show that petitioner, who had been referred to in the information as "Henry Hawks" and "Charles Henry" did not use aliases.

In connection with the extremely weak case made out by the defense, certain observations are necessary and appropriate.

3. In connection with Dr. McCleneghan's testimony the following observation is important. The affidavit of Dr. C. J. Toohey was filed in this habeas corpus proceeding and in this affidavit Dr. Toohey states:

"1. That in February and March, 1934, I was employed or was engaged in staff duties at the Lord Lister Hospital, Omaha, Nebraska.

"2. I recall the case of one Isadore Perelman, a grocer, in Omaha, who was shot point blank in the abdomen during an attempted robbery of his establishment.

"3. I recall that he entered the Lord Lister Hospital in shock and critical condition soon after the shooting incident. I further recall that I spent about one hour getting him out of shock and transfusing blood in preparation for surgery. We opened the abdomen and closed several punctured intestine, a ruptured liver, and removed the bullet from the spine."

It should also be noted that the coroner's report of the Perelman death shows only the name of Dr. Toohey, not Dr. McCleneghan. It is highly probable in view of these matters that Dr. McCleneghan did not remove the bullet. The court does not imply perjury, but merely calls attention to Dr. Toohey's affidavit to show what proper investigation of Hawk's case prior to trial could have uncovered.

4. Nowicki's testimony, at least as to details, leaves a great deal to be desired. He testified that he purchased a gun for two felons to use in undisclosed "play"; and that without knowing the project he drove them to the scene of the crime. Although Nowicki did the driving, he does not know whose car he was driving. He also testified that he had known Hawk for two or three months prior to February 28, 1934. He persists in that statement before this court, and claims that he first met Hawk at 2510 Vinton Street in Omaha, Nebraska. Records of the Iowa State Penitentiary show that in 1934, Hawk was serving a five-year sentence for grand larceny and was not released from that institution until February 1, 1934. That Nowicki had something to gain by giving the testimony, true or false, for the state, is evident from the fact that he was never prosecuted for the Perelman robbery and shooting and that the county attorney's office made favorable recommendations for probation of Nowicki who was serving time for another offense.

5. Nowicki's was the only testimony given at the trial which implicated petitioner. Nowicki was an accomplice. His testimony so set raised a host of involved questions for close study of facts and law. If his evidence was uncorroborated, and if he swore falsely in regard to a material matter, or in the alternative perhaps, if his testimony was unreliable because of inherent incredibility or hope of lessened punishment, then defendant might have been entitled to a directed verdict. Cf. Jahnke v. State, 68 Neb. 154, 94 N.W. 158, 104 N.W. 154; Ruzicka v. State, 137 Neb. 473, 289 N.W. 852; Millslagle v. State, 137 Neb. 664, 290 N.W. 725; Id., 138 Neb. 778, 295 N.W. 394.

Hawk had by letter requested that several witnesses be subpoenaed to give testimony on his behalf. A subpoena issued March 17, 1936, directed to Merril Fite, Mary Mullen and Henry Meyers was returned and signed by a deputy sheriff with the following endorsement, "Merril Fite and Mary Mullen not served by order Atty." It is clear that the petitioner Hawk did not authorize this order and that it was prejudicial to his rights. However, sixteen years have passed since the petitioner's trial and it is not easy to ascertain the extent or degree of prejudice.

Petitioner intended to prove through "Merril Fite" that he was at the "Fite" home on the night of the murder and thus could not have been at the scene of the crime. Careful examination of the testimony and documentary exhibits in this case leads the court to the belief that Merril Fite did not exist. In all probability, petitioner, confused in his thinking, inadvertently combined the name of Merill Meeks, the owner of a garage where petitioner had been seen painting automobiles, with the name of Herschell C. Fiatte, the owner of a home where petitioner had roomed.

Petitioner intended to prove through Mary A. Mullen, a former United States Commissioner, that Eddie Nowicki, the only witness linking him with the crime, was "lying" when he stated that he had known Hawk on the date of the murder, February 28, 1934. Petitioner stated that he had appeared before Miss Mullen on a Dyer Act charge on June 17, 1934, and at that time Eddie Nowicki had testified, under oath, that he had not known Henry Hawk prior to April 17, 1934, at which time he stated he had purchased a stolen automobile from Hawk. Although Miss Mullen does not now, eighteen years after the time in question, recall Nowicki's testimony before her in 1934, the court is not prepared to say that she would not have remembered his testimony in 1936, less than two years after it had been given. In any event, it seems that petitioner should have been given the opportunity at this trial to subpoena Miss Mullen as a witness on his behalf and examine her, under oath, as to her recollection, if any, of Nowicki's testimony.

Marvin Casteel and William Poage of the Missouri State Highway Patrol, Jefferson City, Missouri, Edward Wallace, Sheriff, Maryville, Missouri, and J. O'Grady, Warden, Nebraska State Penitentiary, were other witnesses requested by the petitioner, who were not subpoenaed and did not appear.[6] With their testimony petitioner intended to discredit and impeach the testimony of Nowicki.

Counsel for the petitioner advised him to take the stand in his own behalf; but petitioner refused to do so, relying on his privilege against self-incrimination. Petitioner, a previously convicted felon, did not want, by taking the stand, to leave himself vulnerable to attack by impeaching evidence of past crimes which would undoubtedly prejudice the jury against him. Consequently, with the production of a single witness, the defense rested.

On the 18th of March, 1936, the third day of the trial, the case was argued to the jury. When the public defender had finished his closing argument, the petitioner, gravely concerned over the fact that no defense had been presented in his behalf, asked for and was granted permission to make an argument to the jury.

Upon completion of the arguments, the court instructed the jury. Counsel for petitioner did not request, and the trial court did not give, an instruction on the lesser degrees of homicide.[7] Counsel for petition-

6. The court does not mean to imply that all of these witnesses would have been required to respond to subpoenaes, but merely notes that Hawk had made known his desire for their testimony and if his counsel would have had time he could have taken their depositions or at least ascertained if their testimony would have been helpful.

7. There are three degrees of homicide in Nebraska. Comp.Stat.Neb.1929, Secs. 28-401 to 28-403, incl. Upon an information for murder in the first degree, conviction for murder in the second degree or manslaughter is in some instances proper. Boche v. State, 84 Neb. 845, 122 N.W. 72; Haddix v. State, 76 Neb. 369, 107 N.W. 781; Davis v. State,

er did not request, and the trial court did not give, an instruction guiding the use by the jury of the evidence of Nowicki, the accomplice.[8] Counsel for petitioner did not request and the trial court did not give, an instruction withdrawing from the substantive consideration of the jury the extra-judicial statements of De Santi and Taylor.[9] In instructing the jury with respect to the credibility of witnesses and the weight to be given their testimony, the trial court, among other things, stated: "Yet you have no right to reject the testimony of any of the witnesses without good reason and should not do so unless you find it unreconcilable with other testimony which you find to be true." [10]

When the trial court finished giving the instructions, the jury retired; and a short time later returned with a verdict of guilty.

Attorney Baldwin immediately filed a motion for a new trial. There is some indication that this motion was filed at the direction of the trial court. The motion, which was in the statutory language and filed in time, was filed in the absence of the public defender who was called out of town by reason of illness in the family. The motion recites the following:

"Comes now the defendant and moves the court to grant a new trial in the above entitled case for the following reasons:

"1. Errors of law occurring at the trial.

"2. Errors of fact occurring at the trial.

"3. Newly discovered evidence which the defendant exercising ordinary diligence was unable to produce at the trial.

"4. That the judgment is contrary to the evidence.

"5. Irregularity on the part of witnesses for the State.

"6. Irregularity on the part of County Attorneys for the State."

The petitioner upbraided Attorney Baldwin for filing the motion. Apparently petitioner was of the opinion that the motion was insufficient to preserve his legal rights in a proceeding in error. The next morning, March 19, 1936, the motion, which was submitted in the absence of the public defender without argument, was overruled. The petitioner was sentenced to life imprisonment in the Nebraska State Penitentiary and returned to the Federal Penitentiary at Leavenworth, Kansas.

On April 10, 1936, petitioner himself prepared and filed a poverty affidavit, requesting that the cost of the transcript,

---

51 Neb. 301, 70 N.W. 984. If permissible inferences warrant lesser degrees go to the jury. Davis v. State, 116 Neb. 90, 215 N.W. 785; Denison v. State, 117 Neb. 601, 221 N.W. 683. The need for assistance of counsel to present this matter is illustrated in Tomkins v. Missouri, 323 U.S. 485, 65 S.Ct. 370, 89 L.Ed. 407, and Williams v. Kaiser, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398. The Supreme Court of the United States thought it important in this case. Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61.

8. It is undoubtedly the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them. But this does not mean that defendant is entitled to a reversal where he has failed to request such an instruction. Cornell v. State, 138 Neb. 708, 711, 294 N.W. 851; see also Dyson v. State, 107 Neb. 774, 186 N.W. 984.

9. In Cornell v. State, 139 Neb. 878, 883, 299 N.W. 231, 233, Justice Paine, speaking for the court, comments: "In conclusion, we have tried to make it clear that the impeaching statement, exhibit No. 7, taken in the attorneys office before several witnesses, is not proof of anything, as it is not substantive evidence. Its only purpose is to explain to the jury the reason why a hostile witness was called to the stand by the state."

10. The Nebraska Supreme Court has held that such an instruction is erroneous and ordinarily prejudicial. Schluter v. State, 151 Neb. 284, 37 N.W.2d 396; Jennings v. State, 150 Neb. 828, 36 N.W.2d 268; Knihal v. State, 150 Neb. 771, 36 N.W.2d 109, 9 A.L.R.2d 891; Swanson v. State, 150 Neb. 761, 35 N.W.2d 823; Frank v. State, 150 Neb. 745, 35 N.W.2d 816.

bill of exceptions and all filing fees for appeal be paid by the State. Petitioner also prepared the notice of appeal and filed a praecipe for the transcript. On this same day an order was entered by the court directing the clerk of the district court to prepare the transcript and the reporter a bill of exceptions at the cost of the county.

On May 20, 1936, the court reporter wrote the petitioner with reference to the bill of exceptions, explaining to him that she had 40 days from the beginning of the term, about May 5th, to prepare the bill of exceptions which would be ample time. On May 25, 1936, the reporter wrote the petitioner that the bill of exceptions was ready for delivery, and asked him if he wished it sent to him or his attorney at Superior, Wisconsin. The attorney referred to was one J. J. Cardigan, a former inmate of the Leavenworth Penitentiary and an acquaintance of the petitioner.

On June 2, 1936, the trial judge on his own motion extended the time for preparing the bill of exceptions 40 days commencing from the date of June 11, 1936.

On June 9, 1936, the trial judge wrote to J. J. Cardigan, Superior, Wisconsin, replying to Cardigan's letter of June 6, 1936, written to the court reporter and apparently requesting the bill of exceptions. In his letter the trial judge stated: "I will say that I am of opinion that you and Mr. Hawk are going to get yourselves in a situation, if you don't look out, where Hawk will have no appeal to our Supreme Court. To make either a transcript or a bill of exceptions or both, and forward them to you, will not be effective in the matter of preparation of an appeal." The trial judge explained in detail the necessary procedure to perfect an appeal by writ of error, pointing out the method provided for settling the bill of exceptions and the requirement that the bill of exceptions had to be filed in the Supreme Court within the time allowed. The trial judge went on to say:

"So far as we are concerned, we will not send any transcripts of evidence to you. After they are filed in the Supreme Court you may make your application to the clerk there, since both the transcript and the bill of exceptions are files of the Supreme Court after an appeal has been perfected.

"There is no desire on anyone's part here to prevent Mr. Hawk's taking his appeal, but we do not want him or anyone else to say, if he does not comply with the law, that he has been prevented from doing so by the neglect of anyone here, and that is the reason I am writing you this letter today."

A copy of this letter was sent to petitioner.

On June 10, 1936, the petitioner filed an application in the district court for Douglas County for extension of time to perfect the appeal. On June 20, 1936, petitioner prepared and filed a motion in the district court of Douglas County for an extension of 60 days time to file transcript and bill of exceptions in the Supreme Court.

The bill of exceptions remained in the trial court until after the time for filing it had expired, and it was then turned over to the county attorney's office, where it was uncovered more than a year later by counsel appointed to represent petitioner in another matter in the United States District Court.

### Due Process of Law

In its most elemental sense the Due Process Clause in the Fourteenth Amendment of the United States Constitution embraces the concept of a fair hearing. The petitioner did not have a fair hearing. Upon "an appraisal of the totality of facts" —the events leading up to, and occurring at, the trial of Henry Hawk in 1936—it is readily apparent that there has been a "denial of fundamental fairness, shocking to the universal sense of justice." There has been a denial of due process of law. Cf. Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595.

The Fourteenth Amendment is violated when a defendant in a capital case is forced by a state to trial in such a way as to deprive him of the effective assistance of counsel. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158; House v. Mayo, 324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739; Hawk v. Olson, 326 U.S. 271, 66 S.

Ct. 116, 120, 90 L.Ed. 61. In the case under consideration, the petitioner's drastic need for counsel was apparent and the trial judge's duty clear.[11] The decision of the judge to appoint the public defender to represent petitioner was commendable in many respects. However, when the public defender's request for a twenty-four hour continuance to investigate the case and prepare for trial was denied, the appointment of counsel was reduced to a mere "ritualistic gesture". "Defendant needs counsel and counsel needs time." Hawk v. Olson, supra. As Justice Sutherland points out in Powell v. Alabama, 287 U.S. at page 58, 53 S.Ct. at page 60: "It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate. No opportunity to do so was given. Defendants were immediately hurried to trial. Chief Justice Anderson, after disclaiming any intention to criticize harshly counsel who attempted to represent defendants at the trials, said: '* * * The record indicates that the appearance was rather *pro forma* than zealous and active * * *.' Under the circumstances disclosed, we hold that defendants were not accorded the right of counsel in any substantial sense. To decide otherwise, would simply be to ignore actualities."

The public defender, recognizing the possibility that the hearing might develop into a "Roman Holiday" and somewhat irritated by the trial judge's ruling, left petitioner without any counsel at all during the arraignment and early moments of the trial. In this connection we call attention to another statement of Justice Sutherland in Powell v. Alabama, 287 U.S. at page 57, 53 S.Ct. at page 59: "In any event, the circumstance lends emphasis to the conclusion that during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself." And in a case involving the very situation now before us, Justice Reed remarked: "We think there was an allegation that no effective assistance of counsel was furnished in the critical time between the plea of not guilty and the calling of the jury. Continuance may or may not have been useful to the accused but the importance of the assistance of counsel in a serious criminal charge after arraignment is too large to permit speculation on its effect. We hold that denial of opportunity to consult with counsel on any material step after indictment or similar charge and arraignment violates the Fourteenth Amendment." Hawk v. Olson, 326 U.S. 271, 278, 66 S.Ct. 116, 120. Not only did the trial court deny the public defender's motion for a twenty-four hour continuance, but the record shows that petitioner's own motion for a twenty-four hour continuance made immediately following arraignment, when petitioner stood unrepresented before the court, was also denied. The inescapable conclusion is that the Fourteenth Amendment was violated. "It is true that great and inexcusable delay in the enforcement of our criminal law is one of the grave evils of our time. Continuances are frequently granted for unnecessarily long periods of time, and delays incident to the disposition of motions for new trial and hearings upon appeal have come in many cases to be a distinct reproach to the administration of justice. The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel

11. Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158: "All that it is necessary now to decide, as we do decide, is that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law".

and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob." Powell v. Alabama, 278 U.S. 45, 59, 53 S.Ct. 55, 60.

Although the charge was served on petitioner a short time in advance of trial, he had neither the opportunity nor the ability to prepare his defense. He was confined in jail more than two hundred miles away from the place where the alleged crime had been committed and where the information against him was pending. He was absent from his friends and had no means of investigating the charge against him. He was without legal aid and the public defender did not contact him until the night before the trial. Even his meager efforts to secure witnesses on his own behalf were wholly frustrated by those who had the obligation of providing him with a fair trial. There is no due process of law where, in a situation such as this, the accused does not have a fair opportunity to meet the case of the prosecution. Cf. Carter v. Illinois, 329 U.S. 173, 174, 67 S.Ct. 216, 91 L.Ed. 172; Adams v. U. S. ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268; Hendryx v. State, 130 Ind. 265, 268–269, 29 N.E. 1131, quoted in Powell v. Alabama, 287 U. S. 45, 72, 53 S.Ct. 55, 77 L.Ed. 158.

It is urged by the attorney general of Nebraska that petitioner by his conduct—refusing to discuss his case with the public defender on the eve of, and morning before, trial—waived his right to assistance of counsel. This court does not understand that basic rights are so unconsciously destroyed. " * * * 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and * * * we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment * * of a known right * * *. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." Johnson v. Zerbst, 304 U.S. 458, 464, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461. The court recognizes that petitioner's attitude was, at first, not consistent with any desire to have the public defender represent him. Petitioner's animosity toward the public defender was only natural. The public defender was an employee of the state; the state was prosecuting petitioner. Petitioner indicates that he desired different counsel and generally speaking a defendant has a right to be represented by counsel of his own choice. See Cooper v. Hutchinson, 3 Cir., 1950, 184 F.2d 119. The trial court, however, made no effort at the trial to ascertain petitioner's wishes in this respect. The petitioner was required to accept the services of the public defender. Although "neither the historic conception of Due Process nor the vitality it derives from progressive standards of justice denies a person the right to defend himself",[12] the petitioner in this case was not allowed to actively participate in his own trial until the closing arguments. Under these circumstances, whether petitioner desired to waive counsel or not, it is clear that he was not permitted to do so.

This case, like Gibbs v. Burke, 337 U.S. 773, 69 S.Ct. 1247, 93 L.Ed. 1686, is the type of case referred to in Betts v. Brady, supra, 316 U.S. at page 473, 62 S.Ct. 1252, as lacking in fundamental fairness because neither effective assistance of counsel nor adequate judicial guidance or protection was furnished at the trial. The lack of opportunity for the public defender to investigate the case, the confusion occurring at the trial, and the manner in which questionable issues of procedure, evidence and instructions were allowed to pass unnoticed by both the public defender and the trial judge demonstrate to this court that petitioner did not have a trial that measures up to the test of fairness prescribed by the Fourteenth Amendment.

Therefore, petitioner must be released.

12. Carter v. Illinois, 329 U.S. 173, 174, 67 S.Ct. 216, 218, 91 L.Ed. 172.